**John T. SATTERWHITE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 67220.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 17, 1986.

Certiorari Granted in Part
June 1, 1987.
See 107 S.Ct. 2480.

Richard D. Woods, Stephen P. Takas, San Antonio, Court-appointed, for appellant.

Bill M. White, Dist. Atty. and Bill Harris, Roy R. Barrera, Jr., and Alan E. Battaglia, Asst. Dist. Attys., San Antonio, Robert

Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

This is an appeal from a conviction for the offense of capital murder. The punishment is death.

The appellant contends that the trial court erred in overruling his motion for new trial. He asserts that the State selectively discriminated against him in violation of the due process and equal protection clauses of the Fourteenth Amendment by prosecuting him for capital murder. The appellant contends that he was sexually discriminated against since females in similar situations received more lenient treatment.

At a hearing on the appellant's motion for new trial, three attorneys, who had practiced criminal law in the county, testified. One of them stated that he felt it was the prosecution's practice to seek greater penalties for men than women. Another stated that it was his experience that females got better deals than males. Finally, appellant's counsel testified that in every case he had seen where the co-defendants are male and female, the female always got the better deal. The State presented no evidence.

In order to establish a constitutional violation by the selective prosecution of a defendant, it is necessary to show more than mere unequal application of a state statute. As the Supreme Court stated in *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 466 (1962):

> [T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case imply a policy of selective enforcement, it was not stated that the selection was *deliberately* had upon an unjustifiable standard such as race, religion, or other arbitrary classifications. (Emphasis added)

Therefore, it is necessary that the accused show an intentional or purposeful discrimination in the enforcement of the statute against him. A discriminating purpose will not be presumed; a showing of clear intentional discrimination is required. *Armendariz v. State,* 529 S.W.2d 525 (Tex.Cr.App. 1975); *S.S. Kresge Co. v. State,* 546 S.W.2d 928 (Tex.Civ.App., Dallas, 1977); *Super X Drugs of Texas, Inc. v. State,* 505 S.W.2d 333 (Tex.Civ.App., Houston, 1974); *Enntex Oil and Gas Co. (of Nevada) v. State,* 560 S.W.2d 494 (Tex.Civ.App., Texarkana, 1977). The appellant has failed to show actual or purposeful discrimination. His ground of error is overruled. Also see *U.S. v. Hayes,* 589 F.2d 811 (5th Cir.1979); *U.S. v. Heilman,* 614 F.2d 1133 (7th Cir. 1980); *U.S. v. Diggs,* 613 F.2d 988 (D.C.Cir. 1979); *U.S. v. Larson,* 612 F.2d 1301 (8th Cir.1980); *U.S. v. Choate,* 619 F.2d 21 (9th Cir.1980).

In two grounds of error the appellant argues that the trial court erred by refusing his challenge for cause to a prospective juror. The appellant contends that this prospective juror admitted having a bias or prejudice against a law upon which the defense was entitled to rely. See Art. 35.16(c)(2) V.A.C.C.P. Appellant argues that the juror had a bias against allowing a defendant not to testify or defend himself. During voir dire of venireman Mavis Corderman, the following occurred:

ON BEHALF OF THE DEFENSE
BY MR. TAKAS:

Q. Now, you have heard people talk about presumption of innocence. The presumption of innocence that every person is presumed innocent until proven guilty, do you understand that concept or do you believe you understand that concept.

A. Yes, sir.

Q. So to say what it means is that I don't have to say anything to disprove his guilt. I do not have to take any affirmative action to say I'm not guilty. I do not have to answer accusers because I'm innocent and the law presumes I'm innocent and the Consti-

tution of the State of Texas and United States of America says I am innocent and until they lift that cloak of innocence by fair and competent evidence. Do you have any quarrel with that concept?

A. You are telling me that in other words you don't have to defend yourself.

Q. If you have a quarrel with that say it. My mother has a quarrel with it.

A. Well, I guess I do. I don't know if I would call it quarrel, but—

Q. Do you have a bias against the law that says that the Defendant does not have to defend himself?

A. There again, I guess maybe I do. I haven't thought about that.

Q. Okay.

MR. TAKAS: We challenge for cause, Judge. Bias or prejudice exists on the basic theory of law.

· THE COURT: Do you wish to inquire?

MR. HARRIS: Yes, sir.

\* \* \* \* \* \*

ON BEHALF OF THE STATE
BY MR. HARRIS:

Q. There are a number of ways a defendant can defend himself. One of those ways can be merely asking questions of the witnesses against him, that being cross examination. I think the real question is the 5th Amendment to the United States Constitution says a person shall not be required to testify against himself or offer evidence against himself.

What that means is you will be instructed in a case where a defendant does not testify, you are instructed that you cannot and must not, first of all, it says you are instructed that the Defendant in this case has elected not to testify. You are instructed that you must not and you cannot consider that as any evidence against him. The mere fact that he did not testify. Do you think you could follow an instruction like that?

A. Yes.

THE COURT: What was your answer?

THE WITNESS: Yes. I don't quite understand what he is saying.

THE COURT: Let me see if I can help you a little, Mrs. Corderman.

BY THE COURT:

Q. The Defendant doesn't have to prove his innocence. We have talked about presumption of innocence.

A. Right.

Q. The State has the burden of proving his guilt which means they have to put on the evidence. He doesn't have to put on anything. If he and his attorneys think it's better for him to just sit there and see what they do, the law permits him to do that and you must reach your verdict based on the evidence that is offered, not the evidence that is not offered.

A. I think I can make a decision.

MR. TAKAS: Judge, I don't think that is a correct statement.

THE COURT: I will overrule the challenge for cause. You may question.

MR. TAKAS: Note my exception for challenge for cause and you are overruling it.

Article 35.16(c)(2), supra, provides:

A challenge for cause may be made by the defense for any of the following reasons:

\* \* \* \* \* \*

(2) That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof on the punishment thereof.

In order to determine if a venireman was subject to a challenge for cause, we must examine the testimony given by the venireman on voir dire in its entirety. *Evert v. State*, 561 S.W.2d 489 (Tex.Cr.App.1978). In reviewing the testimony given above, we conclude that the appellant has failed to establish that the prospective juror was

subject to challenge for cause pursuant to Art. 35.16(c)(2), supra. The testimony of the juror elicited from both the prosecution and the trial court indicate that the juror was capable of following an instruction that she would not consider the appellant's failure to testify or present evidence as any evidence against him. The record does not support the appellant's contention. See *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr. App.1978), *cert. denied* 441 U.S. 888, 100 S.Ct. 190, 62 L.Ed.2d 123; *Simmons v. State*, 594 S.W.2d 760 (Tex.Cr.App.1980); *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr. App.1980). Compare *Pierce v. State*, 604 S.W.2d 185 (Tex.Cr.App.1980); *Cuevas v. State*, 575 S.W.2d 543 (Tex.Cr.App.1978); *Evert v. State*, supra. His grounds of error are overruled.

The appellant in his next ground of error contends that the trial court erred in overruling his motion to suppress evidence seized by Officer Jackley. The appellant argues that a pistol, subsequently shown to be the murder weapon, was unlawfully seized.

Officer Jackley testified that he was a police officer with the Live Oak Police Department. On March 13, 1979, he was clocking the speed of automobiles with radar on a highway. At approximately 10:17 p.m., he noticed a vehicle traveling at eighty-two miles per hour. The officer immediately pulled behind the vehicle and turned on his overhead lights and emergency lights. The automobile did not stop but did slow down to about sixty-five miles per hour. The car was traveling in the left lane of a divided four-lane highway and no attempt was made by the driver to move over to the right lane. Officer Jackley flashed his high beams to attract the attention of the driver. He noticed that the passenger kept turning around to look back at him and that the driver kept adjusting the rear-view mirror. He stated that there was generally a lot of movement in the car. He then turned his spotlight on the car to see the movement and get their attention. Jackley testified that the passenger looked as if she were bending over in the seat and the driver continued to fidget with the mirror.

The officer pursued the vehicle for about one mile when suddenly the vehicle quickly exited the highway to the left onto the grassy median and came to a stop. The area was dark and Officer Jackley was alone. He radioed the dispatcher his location and stepped from his vehicle. The appellant stepped out from the driver's side and approached the back of his automobile. Officer Jackley then asked the female passenger, Sharon Bell, to also get out of the automobile. She complied with his order and the officer turned them around and began to pat them down for weapons. He stated that the pair acted in a very nervous fashion. Bell asked Jackley what he was doing and he told her that he was checking for weapons. Bell immediately became quiet and then started walking toward their automobile. She walked toward the driver's side where the door was still open. Officer Jackley ordered her to stop but she continued to walk on toward the open door. Again, he ordered her to stop as she reached the door and she stopped. She started to say something and the officer ordered her to return to the back of the vehicle.

Officer Jackley sat down in the driver's seat of the appellant's automobile and felt around the seat. As he was doing this, the pair walked around to see what he was doing and he ordered them to get back. The officer then opened the glove box and found a pistol. The officer stated that he believed the pair was armed and that he was in fear of his life. The pistol was admitted in evidence at trial.

The appellant argues that the weapon was seized pursuant to an unlawful search. We do not agree.

■ In the present case, there can be no question that Officer Jackley's initial stop of the automobile appellant was driving was valid and proper. The officer saw that the traffic violation of speeding had occurred. Art. 6701d, § 166, Vernon's Ann. Civ.St.; *Borner v. State*, 521 S.W.2d 852 (Tex.Cr.App.1975). Additionally, the officer saw the appellant fail to stop his vehicle after being given a signal to stop, Art.

6701d, § 186, supra, and appellant improperly stop the vehicle. Art. 6701d, § 75, supra. Therefore, the officer was authorized to stop the vehicle and arrest any person found committing the traffic offenses. Art. 6701d, § 153, supra; Art. 14.-01(b) V.A.C.C.P. Furthermore, since Officer Jackley had seen the commission of a traffic offense other than the offense of speeding, he, in addition to arresting the appellant, was authorized to take the appellant into custody. *Christian v. State*, 592 S.W.2d 625 (Tex.Cr.App.1980) (opinion on rehearing, *cert. denied* 446 U.S. 784, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980); *Tores v. State*, 518 S.W.2d 378 (Tex.Cr.App.1975).

The Supreme Court, in *New York v. Belton*, 453 U.S. 2860, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), recently stated the following:

> [N]o straightforward rule has emerged from the litigated cases respecting the question involved here—the question of the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants.

> \* \* \* \* \* \*

> When a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority. While the *Chimel* [*v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ] case established that a search incident to an arrest may not stray beyond the area within the immediate control of the arrestee, the court here found no workable definition of 'the area within the immediate control of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its recent occupant. Our reading of the cases suggests that generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary item.' *Chimel*, supra, at 763 [89 S.Ct. at 2040]. In order to establish

the workable rule this category of cases requires as we read *Chimel*'s definition of the limits of the area that may be searched in light of that generalization. Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

We conclude that Officer Jackley's search of the vehicle was a search incident to arrest and was therefore lawful. Furthermore, we believe that even if the appellant's arrest at the time of the search was not custodial, it would, nonetheless, be lawful.

We have acknowledged that an officer should be permitted to take every reasonable precaution to safeguard his life in the process of making an arrest, even though the arrest is initially non-custodial. See *Lewis v. State*, 502 S.W.2d 699 (Tex.Cr. App.1973). If, under the totality of the circumstances presented to the officer, he has reasonable grounds to believe that he is in danger of bodily harm or that the person he encounters is armed and dangerous, only then will justification for such a search exist. *Lewis v. State*, supra.

In the case at bar, the evidence reflects that the officer had reasonable grounds to believe that he was in danger of bodily injury and the limited search was conducted solely for his own protection. In light of the evidence of the case, the hour of the night, the movement inside the car, and the actions of occupants after the stop, we conclude that the officer was justified in believing he was in danger. The area searched by the officer was one in which the occupants could have easily reached and obtained a weapon. *Imhoff v. State*, 494 S.W.2d 919 (Tex.Cr.App.1973); *Lewis v. State*, supra, *Borner v. State*, supra. Compare *Wilson v. State*, 511 S.W.2d 531 (Tex.Cr.App.1974); *Keah v. State*, 508 S.W.2d 836 (Tex.Cr.App.1974). The search was lawful; appellant's ground of error is overruled.

The appellant in his next ground of error asserts that the evidence is insufficient to

corroborate the testimony of the accomplice witness, Sharon Bell. The jury was instructed that if an offense occurred, Bell was an accomplice as a matter of law.

Article 38.14, V.A.C.C.P., provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

In applying the statute to cases where the sufficiency of the evidence to corroborate the accomplice is challenged we eliminate from consideration the evidence of the accomplice witness and examine the other evidence to ascertain whether there is inculpatory evidence tending to connect the defendant with the commission of the offense. *Moron v. State,* 702 S.W.2d 624 (Tex.Cr.App.1985); *Cruz v. State,* 690 S.W.2d 246 (Tex.Cr.App.1985); *Brown v. State,* 672 S.W.2d 487 (Tex.Cr.App.1984). *Rice v. State,* 587 S.W.2d 689 (Tex.Cr.App. 1979) (opinion on rehearing); *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979); *Shannon v. State,* 567 S.W.2d 510 (Tex.Cr. App.1978); *Edwards v. State,* 427 S.W.2d 629 (Tex.Cr.App.1968).

In the present case, Sharon Bell, the accomplice, testified that on the morning of March 12, 1979, she and the appellant drove to the Lone Star Ice and Food Store. The pair entered the store and Bell got a Coke. She asked the deceased about some teething medicine and Robitussin for babies. While they were inside, Bell noticed another customer. The customer told the deceased that if she needed anything he would be painting around the corner. The man left. Bell also noticed that another customer, a young Mexican-American male, came in and left.

After he left, the appellant and Bell approached the cash register where the deceased was standing. Bell asked for two or three packages of Kool cigarettes. The deceased placed them on the counter, whereupon the appellant pulled a pistol out, pointed it at the deceased, and demanded that the deceased give him money.

The deceased opened the cash register and placed the money in a paper sack. The deceased then volunteered that there was more money in the vault. The three went to the vault where the deceased opened the vault and placed the contents in the sack and handed it to Bell. Bell then headed for the door. When she left the vault area, the appellant was pointing the gun towards the deceased's temple. As she was leaving the store she heard the deceased ask the appellant not to shoot her. She then heard two or three gunshots. The pair got in the car and left. When she asked the appellant why he shot her, he stated he did not want to leave any witnesses.

Later that day, the appellant, with his brother and Bell, went to a car rental. The vehicle used in the offense was rented and they returned it and exchanged it for a Cougar. The appellant gave his brother cash from the robbery to rent the vehicle.

On the following day Bell, the appellant, and a companion went to Seguin. They returned to San Antonio to drop off the companion and then attempted to return to Seguin. Bell stated that on the return trip, they were stopped by a police officer and the pistol used in the robbery was found. Bell later told the police the pistol was hers and was subsequently convicted of unlawfully carrying a weapon. She testified that she told the police that the gun was hers so that both of them would not have to go to jail. At trial, Bell denied that the gun belonged to her.

Bell admitted that she had been convicted of the offense of murder with malice in 1974. She also stated that she was convicted for theft and was fined.

The non-accomplice evidence reveals that on the day of the offense, Aaron Archterberg went to the store before 9:00 a.m. He testified that he bought a seventy-nine cent sponge. It was later shown that the next to last purchase appearing on the cash register tape was for seventy-nine cents. He was painting about a block and a half away from the store. He stated he saw a couple in the store and he identified the appellant as the male. He also stated that he had identified the female and was in-

formed that her name was Sharon Bell. He also stated he remembered that Bell was purchasing or was about to purchase cigarettes which were in a green and white package.

Kenneth Rodriguez testified that he visited the store around 8:35 to 8:40 a.m. He saw the deceased and a couple inside the store. He identified the male as the appellant. He heard the female ask for Robitussin. The couple were still there after he left.

Josie Jeffries testified that she visited the store around 8:30 a.m. When she went in, she noticed that the cash register was open and empty. She also noticed keys and change on the floor. There was a package of Kool cigarettes on the counter. She and other persons who had entered the store then began to search the store; they found the deceased, shot, in the bathroom.

Juan Ramirez stated that he entered the store around 9:00 a.m. He stated that the deceased was not there and that after other people arrived, they looked for her. They subsequently found her and the police were called.

Various police officers stated that after they received a radio call they went to the Lone Star Ice and Food Store. The earliest any of them heard the radio call was 9:10 a.m. They found the deceased with close range bullet wounds in each of her temples. They also found the safe open.

Aric Howorth testified that on March 7 he rented an automobile to Joe Satterwhite. On the afternoon of March 12 Joe Satterwhite returned with his brother, the appellant, and exchanged the first car for a blue Cougar. He stated that the appellant picked out the automobile. He also stated that he was paid in cash.

Officer Mark Jackley testified that on March 13 he stopped a blue Cougar driven by the appellant. He found a pistol in the glove compartment of the vehicle.

Eva Castillo testified that on February 29, 1979, she sold a pistol to Lillie Merri-

weather. The pistol was the same type and contained the same serial number as the one found by Officer Jackley. Subsequent testimony revealed that the appellant's mother's name was Lillie Merriweather.

Two bullets were recovered from the deceased's body. A balistics expert testified that the bullets were fired from the pistol seized by Officer Jackley.

 The non-accomplice testimony is sufficient to corroborate Bell's testimony. The non-accomplice testimony places the appellant at the scene of the crime with the deceased the time she was last seen alive. See *Ayala v. State,* 511 S.W.2d 284 (Tex. Cr.App.1974), *cert. denied* 420 U.S. 930; *Edwards v. State,* supra. The appellant and the accomplice were found to be in possession of the murder weapon and their attempted journey from San Antonio to Seguin may be considered as flight. See *Edwards v. State,* supra. The evidence presented is more than a mere showing that an offense occurred. It is not necessary that the non-accomplice evidence directly link the appellant to the crime or be sufficient for guilt. Rather, all that is required is that the non-accomplice evidence tend to connect appellant with the offense committed. The non-accomplice testimony was sufficient to corroborate Sharon Bell's testimony; the appellant's ground of error is overruled.

The appellant in his next two grounds of error asserts that the trial court erred when it denied appellant's requested jury instructions. The requested instructions would have instructed the jury that if they found that Sharon Bell shot the deceased in furtherance of a conspiracy with the appellant to commit aggravated robbery, they should find the appellant guilty of the offense of capital murder. However, if they found that the murder of the deceased by Sharon Bell was an act of her own volition and not in the furtherance of the conspiracy, they should find him not guilty of capital murder.[1] The requested charges

---

1. The requested instructions were as follows:
 Now, therefore, if you find from the evidence beyond a reasonable doubt that on the

 12th day of March, 1979, in Bexar County, Texas, as alleged in the indictment that Sharon Rene Bell and the defendant, John T. Sat-

were in fact instructing the jury on the issue of whether the killing was on an independent impulse by Bell, and not in furtherance of a conspiracy to commit aggravated robbery. V.T.C.A. Penal Code, § 7.02(b) provides that:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

However, before such a charge is given, there must be evidence before the jury raising the issue.

In the present case there is no evidence that Bell did the actual killing. Additionally, there is no evidence that a conspiracy existed between the appellant and Bell. A charge on a defensive theory is only required when the evidence raises that issue. *Lopez v. State*, 574 S.W.2d 563 (Tex.Cr.App.1978). Furthermore, the evidence presented at trial of the appellant's conduct alone was sufficient to sustain the conviction; no charge on independent impulse was necessary. *Bowers v. State*, 570 S.W.2d 929 (Tex.Cr.App.1978); *McGuin v. State*, 505 S.W.2d 827 (Tex.Cr.App.1974). The trial court did not err in refusing appellant's requested jury instruction; the grounds of error are overruled.

The appellant also contends that the trial court erred in instructing the jury on the law of parties. The trial court, over appellant's objection, gave an abstract instruction on the law of parties defining criminal responsibility according to V.T.C.A. Penal Code, § 7.02(a)(2).[2] The trial court then applied the law to the facts in the instruction. The appellant claims that there was no evidence presented which raised that

terwhite had entered into and were attempting to carry out a conspiracy to commit the crime of aggravated robbery as those terms have been defined for you and that Sharon Rene Bell was then and there attempting to carry out said conspiracy between herself and the defendant, John T. Satterwhite, and you further find that Sharon Rene Bell did then and there with a gun intentionally shoot and kill and thereby cause the death of Mary Frances Davis, and you further find that said offense of murder was so committed by Sharon Rene Bell in furtherance of the unlawful purpose of Sharon Rene Bell and the defendant, John T. Satterwhite, and was one that should have been anticipated as a result of carrying out of their conspiracy to commit the offense of aggravated robbery, then you will find the defendant guilty of the offense of capital murder. If you do not so find or if you have a reasonable doubt thereof, you will acquit him.

You are further instructed that if you find the foregoing facts beyond a reasonable doubt from the evidence that the offense of murder was actually committed by the separate act of Sharon Rene Bell acting of her own separate volition, or you believe or have a reasonable doubt that such offense of murder on the part of Sharon Rene Bell was not in furtherance of the original unlawful purpose of Sharon Rene Bell and the defendant, John T. Satterwhite, or was not such an offense as should have been anticipated as a result of the carrying out of the commission of the crime of aggravated robbery, then you will acquit the defendant, John T. Satterwhite, and say by your verdict not guilty of the crime of capital murder and then determine whether or note [sic] the defendant, is guilty of some other offense as herein defined to you.

You are further instructed that if you find the foregoing facts (referring to the direct charge on parties to an offense who in the commission of one conspiracy commit another conspiracy) beyond a reasonable doubt except that you find from the evidence, or you have a reasonable doubt thereof, that in killing MARY FRANCES DAVIS said SHARON RENE BELL was acting outside of the common plan and design of SHARON RENE BELL and JOHN T. SATTERWHITE or that said killing was not in the furtherance of the common purpose and design of both SHARON RENE BELL and JOHN T. SATTERWHITE and that JOHN T. SATTERWHITE had no knowledge of the intent of SHARON RENE BELL or that said killing was not one that should have been anticipated by the said JOHN T. SATTERWHITE then you will find the defendant not guilty of capital murder, and then proceed to determine if the Defendant is guilty of some lesser included offense.

**2.** Sec. 7.02(a)(2) provides as follows:

A person is criminally responsible for an offense committed by the conduct of another if:

 \* \* \* \* \* \*

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense, ...

issue and that the trial court improperly included the instruction resulting in harm to the appellant.

However a review of the record reveals that the appellant in his Requested Instruction No. 10 requested that the following instruction be given:

Before you are warranted in convicting the defendant of capital murder, you must find beyond a reasonable doubt that on March 12, 1979, that the defendant, John T. Satterwhite, either alone, or as a party to the offense, or in the furtherance of a conspiracy to commit a felony offense, as those terms have been above defined to you, was engaged in the commission of the felony offense of robbery, and also during the commission of the robbery, the defendant, John T. Satterwhite, either alone, as a party to the offense, or in the furtherance of a conspiracy to commit a felony offense, intentionally shot the deceased, with the intention of thereby killing her.

Therefore, unless you find from the evidence beyond a reasonable doubt that the defendant, on the occasion in question, either alone, or as a party to the offense of robbery, or in the furtherance of a conspiracy to commit the offense of robbery, specifically intended to kill the said deceased, Mary Frances Davis, when he shot her, if he did, you cannot convict him of the offense of capital murder. If you have a reasonable doubt, you must find the defendant not guilty of the crime of capital murder.

You are, therefore, instructed that if you find and believe from the evidence beyond a reasonable doubt that the defendant, John T. Satterwhite, in the County of Bexar, State of Texas, on or about the 12th day of March, 1979, committed or attempted to commit the offense of robbery and that in the course of and in furtherance of or in immediate flight from the commission or attempt to commit the offense of robbery, if any, the defendant, John T. Satterwhite, did or attempted to participate in the offense of robbery knowing that one of the participants to the robbery was in possession of a gun, and that this act was clearly dangerous to human life, if it was, and did thereby cause the death of Mary Frances Davis, if it did, then you will find the defendant guilty of murder, but if you do not so find, or if you have a reasonable doubt thereof, you will find the defendant not guilty of murder and next proceed to determine if he is guilty of any lesser offense.

■■■ The instruction requested by the appellant was essentially the same as the instruction subsequently given by the trial court. We also note that appellant's Requested Instruction No. 1 and No. 11, discussed previously, also dealt with the law concerning criminal responsibility. Two additional instructions requested by the appellant involved the law of parties.[3] We therefore conclude that error, if any, in instructing the jury on the law of parties was waived by appellant's requested instructions. Appellant cannot be heard to complain about instructions given by the trial court where it is essentially the same charge as was requested by appellant. This ground of error is without merit.

■■■ Additionally, we note that as the evidence of appellant's conduct alone was

---

**3.** The appellant's Requested Instruction No. 2 requested the following instruction be given:

You are further instructed that if you find from the evidence, or have a reasonable doubt, based from the evidence that the offense of murder was actually committed by the separate act of the defendant, John T. Satterwhite acting of his own separate volition, and you believe, or have a reasonable doubt, that such offense of murder on the part of the other defendant, Sharon Rene Bell, was not in furtherance of the original unlawful purpose of both the Defendants and was not such an offense as should have been antic-

ipated as a result of the carrying out of the offense of robbery, if any, then you will find the defendant, John T. Satterwhite, not guilty of the offense of capital murder and then next proceed to determine from the evidence whether or not the defendant, John T. Satterwhite, is guilty of any lesser included offense.

His Requested Instruction No. 7 requested the following instruction be given:

Mere presence at the scene of a crime does not constitute conduct sufficient, standing by itself, to make a person criminally responsible as a part to an offense for the conduct of another.

sufficient to sustain the conviction, no charge on parties was required. *Todd v. State*, 601 S.W.2d 718 (Tex.Cr.App.1980). The charge made appellant's guilt contingent on a finding that he committed the offense either acting alone or as a party. Because the jury was authorized to convict appellant if it found he was acting alone, any error was harmless. *Todd v. State*, supra. The ground of error is overruled.

Appellant in his next ground of error argues that the trial court erred in admitting into evidence the testimony of a psychiatrist, Dr. Grigson, during the punishment phase of the trial. Appellant maintains that the testimony was obtained in violation of his rights as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Appellant relies upon the recent decision of the United States Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in which Dr. Grigson once again testified during the punishment phase of a capital murder trial. Dr. Grigson was the only witness the State presented during the punishment phase, in which he stated that the appellant was a sociopath and a continuing threat to society. See Art. 37.071, V.A.C.C.P. Dr. Grigson's testimony was based upon an examination of Smith while he was in custody. The Supreme Court held that Dr. Grigson's testimony was inadmissible because prior to the doctor's examination, the appellant was not informed that any statement he made could be used against him and that he had the right to remain silent. Thus, the statements made to the psychiatrist were not freely and voluntarily given and were therefore obtained in violation of his privilege against self-incrimination. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court also held that Smith's Sixth Amendment right to assistance of counsel had been violated. The examination in question took place after the appellant had been indicted, meaning that his right to assistance of counsel had attached. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411

(1972). The Court stated that defense counsel was not given advance notice that the examination would encompass the issue of their client's future dangerousness, and that Smith "was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's finding could be employed." Smith did not waive counsel, therefore the admission of Dr. Grigson's testimony violated his Sixth Amendment right to assistance of counsel.

In the present case appellant similarly argues that both his Fifth Amendment and Sixth Amendment rights were violated by the admission of Dr. Grigson's testimony. Before we address the Fifth Amendment issue we conclude that appellant's Sixth Amendment right to assistance of counsel was violated.

The offense in question occurred on March 12, 1979, and appellant was arrested on March 13. On March 15 or 16 appellant was charged with capital murder.[4] Dr. Grigson testified that on March 19, pursuant to a court order, he attempted to examine appellant. He was unable to conduct the examination at that time but did examine the accused on May 3. The record does not contain a court order instructing Dr. Grigson to examine appellant. As in *Estelle v. Smith*, appellant had already been indicted when this examination took place. Thus, his right to assistance of counsel had attached. *Kirby v. Illinois*, supra. While the attachment of that right does not mean that appellant had a constitutional right to have counsel actually present during the examination, *Estelle v. Smith*, supra, it does mean that appellant's attorneys should have been informed that an examination, which would encompass the issue of future dangerousness, was to take place. Additionally, the attachment of this right meant that appellant could have consulted with his attorney prior to the examination. There is nothing to indicate that appellant gave a knowing, intelligent, and voluntary waiver of his right to counsel, and a waiver will not be presumed from a silent record. We, therefore, con-

---

**4.** Appellant was indicted on April 4 and counsel was appointed on April 10.

clude that Dr. Grigson's testimony was improperly admitted into evidence in violation of appellant's Sixth Amendment right to assistance of counsel.

■ While we conclude that this admission was error we further hold that in light of other evidence presented, its admission did not constitute reversible error. Unlike in *Estelle v. Smith,* Dr. Grigson's testimony was not the only evidence offered by the State during the punishment phase of the trial.

Here, eight peace officers testified that appellant's reputation for being a peaceful and law abiding citizen was bad. One of the officers stated that he had a confrontation with appellant. He said that after receiving a complaint about appellant, he attempted to question him. As he approached appellant, appellant reached inside his waistband. The officer grabbed his hand and found a loaded pistol inside appellant's waistband.

Lee Roy Merriweather testified that he used to be married to appellant's mother. He stated that less than a year before the present offense, he had an argument with appellant. Merriweather locked appellant out of their home and he responded by shooting at Merriweather through the door. The witness was hit twice and was hospitalized for a month.

The evidence presented also showed that appellant had been convicted of aggravated assault, burglary with intent to commit theft, theft under fifty dollars, and robbery by assault with firearms.

Additionally, Dr. Betty Lou Schroeder, a psychologist, testified as to appellant's future dangerousness. *Appellant did not object to Dr. Schroeder's testimony at trial and does not complain of its admission on appeal.* We note that prior to examining appellant, Dr. Schroeder in-

formed him of his rights as outlined in *Miranda v. Arizona,* supra. Additionally, the doctor obtained a release from appellant so as to allow her to release the information she obtained from the interview.

Dr. Schroeder's testimony was very similar to Dr. Grigson's concerning their conclusions about appellant. Both stated that appellant was a cunning individual, very evasive and very guarded. She added that appellant was a user of people, had an antisocial personality and an inability to feel empathy, and would be a continuing threat to society through his acts of criminal violence.

The jury also had the evidence adduced at the guilt stage of the trial for its consideration in answering the special issues at the punishment phase. *Bravo v. State,* 627 S.W.2d 152 (Tex.Cr.App.1983); *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979). The evidence at the guilt stage was undisputed that appellant committed a brutal and senseless murder during the course of a robbery. Even though he had obtained the money from the cash register and safe, he shot the deceased two or three times in the head at close range so that there would be no witnesses. The facts of this crime show that appellant's conduct was calculated and remorseless. *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976).

We conclude that the properly admitted evidence was such that the minds of an average jury would have found the State's case sufficient on the issue of the "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" even if Dr. Grigson's testimony had not been admitted. The admission of the testimony was harmless error beyond a reasonable doubt. *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980). The appellant's Sixth Amendment ground is overruled.[5]

---

**5.** The Court recognizes the holding in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), in which the United States Supreme Court stated that, "this Court has concluded that the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' *Chapman v. California,* [386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705

(1967) ]". While applicable at first glance, the holding in *Holloway* is distinguishable from the case at bar.

In *Holloway,* the Sixth Amendment violation arose through one attorney's joint representation of co-defendants with arguable conflicting interests. The conviction was reversed on the basis that once the existence of a possible con-

As to his Fifth Amendment claim, appellant maintains that Dr. Grigson failed to properly inform him of rights under *Miranda*, supra, prior to the examination. In *Smith*, the Court held that prior to psychiatric interrogation an accused is entitled to be informed of his rights as outlined in *Miranda*, including that he has a "right to remain silent" and that "anything said can and will be used against the individual in court." *Miranda*, 384 U.S. at 467–469, 86 S.Ct., at 1624–1625.

Unlike his examination in *Estelle v. Smith*, in the present case Dr. Grigson testified that prior to any questioning he explained to appellant that the purpose of the interview was to determine appellant's competency to stand trial, his sanity at the time of the offense, and whether he presented a continuing threat to society. Dr. Grigson then admonished appellant that he had the "option to remain silent or to simply refuse the examination and no psychiatric examination would take place." The doctor also told him that the results of the examination "could be harmful or it could be helpful depending upon what the findings would be." Subsequent to these warnings appellant consented to the examination; Dr. Grigson thereafter concluded that appellant would "present a continuing threat to society by continuing acts of violence."

 We find the warnings given to appellant sufficient under the holdings of *Estelle v. Smith* and *Miranda*. No error is presented and appellant's Fifth Amendment claim is overruled.

Appellant in his final ground of error contends that his conviction was obtained in violation of the Speedy Trial Act, Art. 32A.02, V.A.C.C.P. A hearing on appellant's motion to set aside the indictment for failure to comply with the Speedy Trial Act was held on August 27, 1979. The State announced ready and the trial court overruled appellant's motion.

The record reflects that appellant was arrested and charged on either March 15 or March 16, 1979. On April 9 counsel was appointed for appellant and on April 13 he was arraigned. At the arraignment, the State filed a written announcement of ready, a pre-trial hearing was set for May 17, and the trial was set for May 29. On May 29, a hearing was held and several of appellant's pre-trial motions were ruled upon. At the May 29 hearing, one of the district attorneys stated that he was not completely familiar with the files and anticipated that the case would not be tried that week. The trial court stated that he had the same anticipation and it was later revealed that another capital murder case was set for the next week.

At the hearing on August 27 on appellant's motion to set aside the indictment, two members of the district attorney's office testified. Roy Barrera, Jr. stated he subscribed the announcement of ready that was filed on April 13. He testified that he had prepared for the trial prior to April 13 but that the subpoenas had not been sent. However, he had compiled a witness list with their names, addresses and phone numbers so that they could be contacted when needed. He was unsure if all the witnesses had been contacted or whether the psychiatric expert was ready to testify. Barrera, however, testified that he was familiar with the case and the facts and was

flict is presented to the judge, failure to thereafter appoint separate counsel for each co-defendant violated the Sixth Amendment. It was in this limited context that the Court concluded that a violation of one's constitutional right to counsel can never be harmless error; a context in which the violation was so fundamentally unfair, it irrevocably tainted the *entire* proceeding.

The error in the present case, while just as improper, related only to the admission of Dr. Grigson's testimony, rather than to the proceeding as a whole.

We feel certain that the evidentiary nature of this error, rendered harmless by the facts of the crime for which he was on trial, his bad reputation, his use of firearms in the past, his four prior convictions and the uncontested testimony of Dr. Schroeder, was a form of Sixth Amendment violation not contemplated by the Court in *Holloway*. "We decline to follow what one judicial scholar has termed 'the domino method of constitutional adjudication ... wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

ready to go to trial if necessary. He added that he was ready to go to trial without the subpoenas being issued and without psychiatric testimony if necessary. He concluded that he had no doubt that the State could have begun jury selection on that date.

Bill Harris, also of the district attorney's office, testified that he had stated he was not familiar with the file in this case in the middle of May.

Appellant contends that this evidence is sufficient to establish that the State was not ready for trial within the time limits required by Art. 32A.02, supra. We do not agree.

 An announcement of ready by the State is a prima facie showing of compliance with the Speedy Trial Act. *Fraire v. State*, 588 S.W.2d 789 (Tex.Cr.App.1979); *Barfield v. State*, 586 S.W.2d 538 (Tex.Cr. App.1979). However, the defendant may rebut such a showing by presenting evidence that demonstrates that the State was not ready for trial during the time limits of the Speedy Trial Act. *Barfield v. State*, supra. Here, the evidence is insufficient to rebut the State's assertion of readiness; nothing in the record indicates that the State could not have proceeded to trial during the required time limits. *Calloway v. State*, 594 S.W.2d 440 (Tex.Cr.App.1980); Compare *Pate v. State*, 592 S.W.2d 620 (Tex.Cr.App.1980). Appellant's ground of error is overruled.

We have also considered the grounds of error raised in appellant's untimely filed pro se brief. We find these contentions without merit.

The judgment is affirmed.

WHITE, J., not participating.

CLINTON, Judge, dissenting.

For good and sufficient constitutional reasons Article 37.071, § (h), V.A.C.C.P., mandates this Court to review every judgment of conviction for capital murder in which punishment imposed is death. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 ((1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). In a word the objective of our review in any given cause is to assure that a decision to inflict the penalty of death upon the person convicted is free of "arbitrariness." *Gregg v. Georgia*, supra, 428 U.S. at 204–206, S.Ct. at 2939–2940; or in two, that it "will not be 'wantonly' or 'freakishly' imposed." *Jurek v. Texas*, supra, 428 U.S. at 276, S.Ct. at 2958. That is not to say those terms constitute standards or tests by which to assay particular grounds of error, just that they more or less contribute to an understanding of what to guard against in coming to an ultimate conclusion that the State has shown itself entitled to put a citizen to death.

Aside from specific grounds of errors, to me there is an aspect of this cause that is most troublesome: that at punishment testimony of an "expert" in such matters is presented to the jury in violation of appellant's constitutional right to assistance of counsel. My concerns go the heart of the verdict of the jury, the first on guilt and then both on punishment.

The ubiquitous James P. Grigson, M.D., testified in his own inimitable fashion, now well known to every experienced practitioner in capital cases. To find that "in light of other evidence presented," admitting his expert opinion on what is literally a matter of life or death does not amount to reversible error is startling.

*Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), addressed comments on failure of an accused to testify. However, it drew the basic rule from *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), *viz:*

"There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' *Id.*, at 86–87, [84 S.Ct. at 230,] 11 L.Ed.2d at 173."

Developing that proposition, the *Chapman* Court squarely concluded:

"An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under Fahy, be conceived of as harmless."

*Id.*, at 23–24, 87 S.Ct. at 828, 17 L.Ed.2d at 710.

When the issue is punishment, this Court has similarly followed the *Fahy* test confirmed by *Chapman*. *Clemons v. State*, 605 S.W.2d 567 (Tex.Cr.App.1980); also see *Jordan v. State*, 576 S.W.2d 825, 830 (Tex. Cr.App.1978). Finding we could not say that evidence erroneously admitted was harmless beyond a reasonable doubt "given the number of years assessed by the jury," we buttressed that conclusion "by the prosecutor's request to the jury to consider this inadmissible evidence in assessing punishment,.... as well as what seems to us to have been the probable impact of the erroneously admitted evidence on the minds of an average jury during the punishment phase of the trial." *Id.*, at 571–572.

Here too, the jury's answer to special issue two patently is based in part at least on testimony of Dr. Grigson, bolstered by argument of the prosecutor reminding jurors that Dr. Grigson is a "Dallas psychiatrist and medical doctor [as compared to as mere psychologist employed by Bexar County]," and then recounting that "Dr. Grigson ... tells you that on a range from 1 to 10 [appellant is] a ten plus," following that with an iteration of terms Dr. Grigson can explicate so expertly to jurors. Indeed, as in *Clemons*, supra, one may reasonably believe the State's case during the punishment hearing "could have been 'significantly less persuasive' had the evidence been excluded." *Ibid.*

Finally, a few words about voir dire of the lady who exclaimed, *"You are telling me that in other words you don't have to defend yourself."*[1] It is obvious that she did not ever recede from her spontaneously revealed bias (or prejudice depending on where one is coming from). When defense counsel asked her directly if she had "a bias against the law that says that the Defendant does not have to defend himself," she confessed, "I guess maybe I do,"

adding, "I haven't thought about that." Then came appellant's challenge for cause.

The prosecutor took over and after he broached the specific subject of the Fifth Amendment privilege in a lengthy discourse followed by a question, Coderman answered, "Yes." However, when the trial court asked for her answer, she responded, "Yes. *I don't quite understand what he is saying."* So the judge tried to explain burden of proof, ending with "and you must reach your verdict based on the evidence that is offered, *not the evidence that is not offered."* Coderman stated, *"I think I can make a decision."* Over protest of counsel for appellant, the judge overruled his challenge.

Apparently following questions more than reactions to them, the majority opines that her statement to the court that she did not quite understand what the prosecutor was talking about, and her unresponsive enigmatic thought that she could "make a decision" "indicate that the juror was capable of following an instruction that she would not consider appellant's failure to testify or present evidence as any evidence against him." Yet, should we do that which the majority says it must do—examine her voir dire in its entirety—we would have to find that the venireperson herself volunteered, in effect, that she believed the law personally abhorrent that an accused need not defend himself, and she failed to articulate any change in that bias by merely saying she did not understand what the prosecutor was saying and by telling the judge she thought she could "make a decision."

I would conclude the trial court erred in overruling a challenge for "bias or prejudice exists on the basic theory of law," which Coverman revealed, then admitted and never recanted.

For those reasons and also disagreeing with treatment of certain other grounds of error,[2] I respectfully dissent.

**1.** All emphasis supplied.

**2.** For one instance, while the majority may reach the correct result in approving overruling appellant's motion to suppress, its reasoning in some particulars is faulty. It is not enough that

a peace officer is "authorized" by law to arrest any person found committing traffic offenses. A search or seizure issue will turn on what he actually did in the premises. Unless he makes a lawful custodial arrest, *Belton v. New York* (see

TEAGUE, Judge, dissenting.

For those readers unfamiliar with the location of the City of Live Oak, Texas, the official highway travel map of Texas that I have reflects that it is contiguous to the City of San Antonio, and its boundaries lie on both sides of Interstate 35 (east). The well known City of Selma, see December, 1974 and November, 1976 editions of *Texas Monthly*, is located contiguously to the east of Live Oak.

The record reflects that on March 13, 1979, at 10:17 o'clock p.m., Live Oak Police Officer Mark Jackley was "working radar" on Interstate 35, presumably being on the lookout for "speeders" who might then be driving in excess of the posted speed limit of 55 miles per hour. Given the territory and the terrain, Jackley did not have to wait long to catch a speeder. Jackley clocked the speed of the vehicle that was shown to be driven by the appellant at 82 miles per hour.

Art. 6701d, § 166(a), V.A.C.S., provides that no person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions, having regard to the actual and potential circumstances, then existing. However, driving a motor vehicle at a rate of speed in excess of the posted speed limit shall only be prima facie evidence that the speed is not reasonable or prudent and thus unlawful.

Section 148 of the statute, however, provides that the offense of speeding shall be the only offense in our traffic laws making mandatory the issuance of a written notice to appear in court; thus, the police may not, for this offense, take into custody the accused if he gives his written promise to appear in court, by signing in duplicate the written notice prepared by the arresting officer. Two exceptions, which are not applicable to our facts, are if the speeding vehicle is licensed in a state or country other than Texas or if the speeding vehicle is being driven by a resident of a state or country other than Texas.

Based upon the radar reading, Jackley then pursued the vehicle later shown to be driven by the appellant in order to stop it and presumably to give appellant a speeding ticket, with him then being permitted to proceed on his way.

The appellant, however, did not stop his vehicle and, for reasons not reflected in this record, cut over into the grassy median area separating the north and south lanes of Interstate 35 where he then stopped his vehicle. Between the time when Jackley put on his warning lights, as well as when he was using his spotlight, until the appellant stopped his vehicle, there was much movement inside of the appellant's vehicle, which was then occupied by the appellant and a female passenger, by both the appellant and his passenger. The appellant then got out of the vehicle he was driving and walked to the rear of his car. Jackley's vehicle was then parked behind the appellant's vehicle. After Jackley approached the appellant's vehicle, he ordered the female passenger to remove herself from the car, which she did. Jackley then "patted down" both appellant and his female passenger "for weapons." No weapons were found. When asked for a driver's license, the appellant produced a temporary driver's license in the name of "Bobby Ted Satterwhite." The driver's license apparently did not arouse any suspicion on the part of Jackley. During this time, the female passenger started moving toward the driver's side of the door, but, after first disputing Jackley's command to stop, she then complied with his order to return to the rear of the vehicle which she had been riding in. The appellant also commenced getting closer to Jackley, but, upon command, he backed off.

Given the above facts and circumstances, it would appear that a reasonable, prudent police officer would have, when he got the appellant's vehicle stopped, if not before, called for a police back-up unit, or radioed for possible assistance to other law enforcement agencies, such as the Department of Public Safety, which also patrols

majority opinion, at 86), is not applicable, and there can be no search or seizure incident there-

to. *Linnett v. State*, 647 S.W.2d 672 (Tex.Cr. App.1983).

this location. However, Jackley did no such thing.

Jackley, instead, notwithstanding the previous suspicious movements of the appellant and his passenger, decided to then search the interior of the vehicle that the appellant had been driving. While Jackley was looking under the car seats, "for weapons," both the appellant and his passenger started moving closer toward him and Jackley twice had to order them to back off to the rear of the car, which they did. Jackley, undaunted by the strange actions of the appellant and his passenger, continued searching the inside of the car. He eventually got to the glove compartment and after opening same, presumably with his back to the appellant and his passenger, found therein a pistol, which was later shown to be the murder weapon.

The appellant moved in the trial court to suppress the pistol as evidence, but the trial court overruled the motion.

Given the facts and circumstances of this case, as far as the initial stop, and as far as Jackley was concerned, there was only one violation committed, and that was the offense of speeding.

The majority opinion implicitly, but erroneously, holds that Jackley's stopping the appellant's vehicle for speeding then gave him the right to conduct a complete warrantless search of the vehicle, as an incident to the lawful arrest. Such holding flies in the face of our statutory law. As previously pointed out, if a police officer stops a citizen motorist of this State for speeding and the citizen has a valid Texas driver's license and is driving a vehicle with Texas plates thereon, without more, the arresting officer is not permitted to do anything more legally than to issue a traffic citation and send the driver on his way. The majority opinion also holds that because the appellant failed to stop, Jackley had the right to make a custodial arrest of the appellant for violating the provisions of Art. 6701d, § 186 and 75, V.A.C.S., fleeing or attempting to elude a police officer and, get this, failure to yield to an emergency vehicle, Jackley's.

Given the facts and circumstances that went to the issue, I find that this kind of legal thinking and reasoning is preposterous and outlandish. Given a cursory reading of the cases cited by the majority opinion to support its position, they will simply not support its holdings.

The majority opinion does not end its ridiculous legal thinking and reasoning at this point; it plods forward and erroneously holds that Jackley had reasonable grounds to believe that he was in danger of bodily injury, thus giving him the right to conduct a complete search of the interior of the motor vehicle, "solely for his own protection." The majority opinion concludes: "[T]he officer was justified in believing he was in danger." Given the facts and circumstances of what occurred after Jackley stopped the appellant's vehicle, this conclusion is totally erroneous. How any rational human being can conclude under the facts that Jackley had a "fear" that his life might have then been in danger is simply beyond my comprehension. The mere expression of a conclusion by a police officer that he was in fear should never be sufficient to authorize a warrantless arrest or a warrantless search of a person or his motor vehicle. Cf. *Frazer v. State*, 508 S.W.2d 362 (Tex.Cr.App.1974).

Clearly, Jackley's warrantless search of the glove compartment and the warrantless seizure of the pistol therefrom were unlawful under the Constitution and statutory laws of this State. To the majority opinion's contrary holding, I respectfully dissent.

MILLER, J., joins.