Kerry Max COOK, Appellant,

v.

The STATE of Texas, Appellee.

No. 63643.

Court of Criminal Appeals of Texas,
En Banc.

Dec. 9, 1987.

Harry R. Heard, on appeal only, Longview, for appellant.

Hunter B. Brush, Dist. Atty., and Christian Harrison, Asst. Dist. Atty., Tyler, Robert Huttash, State's Atty., Austin, for the State.

OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder. After finding appellant guilty, the jury returned affirmative findings to the special issues submitted under Article 37.071(b)(1), (2) and (3), V.A.C.C.P. The trial court assessed the mandatory death penalty.

On appeal appellant raises numerous points of error, some of which involve the sufficiency of the evidence. We turn first to a review of the facts.

In June, 1977, 21–year–old Linda Jo Edwards, the deceased, was working as a secretary in the English Department of Texas Eastern University in Tyler. According to the testimony of her friend Paula Rudolph, Edwards had been living with Rudolph at the Embarcadero Apartments, No. 169, in Tyler for about two weeks. Although the apartment lease was in Rudolph's name, Edwards had been registered with the apartment office as a guest. According to Rudolph no one else had a key to the apartment. At the time, Edwards had a regular boyfriend named Jim Mayfield who was Dean of the Learning Resource Center at Texas Eastern University. Edwards was not known to be dating anyone else, and Mayfield had been to the apartment to visit Edwards only once.

On the afternoon of June 9, 1977, Rudolph got off work at 5:00 p.m. and went to the stables to go horseback riding, arriving at her apartment at approximately 8:30 p.m. While Rudolph was eating and watching television Edwards came in around 9:30 p.m., and the two chatted for a few minutes. Rudolph testified that Edwards was "happy, laughing," and not at all depressed. Rudolph left the apartment at 10:30 p.m. for a date and stayed out for about two hours.

Upon returning to her apartment between 12:30 a.m. and 12:45 a.m., Rudolph

found the front door closed but unlocked. As she entered, Rudolph saw the figure of a man in Edwards' bedroom. Rudolph testified that the light in the bedroom was very bright, and that the figure was turning and in motion when she saw it. As the figure whirled it stepped out of Rudolph's line of vision and shut the door. Rudolph described the figure as "about my height, very tanned ... wearing what appeared to me in the light white shorts. There was a definite band of white across the lower torso into the top of the leg." Later, on cross-examination, she testified:

"... for those moments as I was closing the door, you know, after the figure whirled, we stood there face to face. I began moving and he began moving almost at the same time."

Rudolph also testified the man had a broad, flat face, that he was slim-hipped and slim-chested, but had fairly broad shoulders for his size. At trial Rudolph identified appellant as the person she had seen, basing her identification upon seeing him on the night of June 9, 1977. Furthermore, Rudolph testified that she had never seen appellant before that night, and that to her knowledge he had never had anyone's permission to be inside her apartment.

As Rudolph entered her apartment that night, simultaneously seeing the figure in Edwards' bedroom, she called out: "Don't worry, it's only me." Rudolph testified that she said this thinking Edwards' boyfriend Jim Mayfield was in the apartment, and that she had no reason whatsoever to believe it was anyone else. Still, she was not completely satisfied that it was Mayfield since it did not really look like him. Rudolph laid down her purse and lit a cigarette, puzzling over the fact that the figure did not look like Mayfield. However, that was the only explanation she could come up with. As she was thinking, Rudolph heard the sliding patio door open and close. Thereafter Rudolph got ready for bed and went to sleep around 12:50 a.m. The next morning at about 7:00 a.m. Rudolph discovered Edwards' mutilated body and summoned the authorities.

During the course of the same evening on June 9, 1977, appellant and Robert Hoehn spent approximately two hours together in the apartment where appellant was staying with James Taylor in the Embarcadero Apartment complex. Testifying for the State but out of the presence of the jury, Hoehn, a 42–year–old homosexual hairdresser, related how appellant had called him several times asking him to bring over some beer. Hoehn arrived at the apartment between 10:35 p.m. and 10:45 p.m. at which time appellant was watching a movie on television entitled "The Sailor Who Fell From Grace With the Sea." After approximately five minutes, appellant suggested they go outside to the pool, where they stayed some 20 to 25 minutes. They later returned to the apartment to watch the remainder of the film. By this time it was about 11:45 p.m. The two then drove to a nearby Kroger Store to buy cigarettes, after which Hoehn dropped appellant off at his apartment.

The trial court permitted the showing of that portion of the film or movie that was seen by Hoehn in appellant's presence, both when Hoehn arrived and when the two came back to the apartment from the swimming pool.

Hoehn testified that on their way to the pool he and appellant passed by Edwards' bedroom window. Appellant said there was a good-looking girl there and tried to get Hoehn to look, but Hoehn refused. Hoehn stated appellant did not make any remarks about what he had seen in the girl's bedroom, and that appellant did not get close enough to look into the window that night. Upon returning to the apartment the two men drank some beer and resumed watching the movie. At one point Hoehn left the room where the television was located to use appellant's bathroom. When Hoehn returned to watch the movie he saw appellant come from the kitchen with an eight-inch, serrated bread knife, saying "Let's cut it up or cut it out."

Hoehn told him to put the knife down and appellant cooperated. Hoehn testified that he took it in a very "jokingly manner."

The film depicted the mutilation of a cat. Although the jury did not see the cat mutilation scene, it did see that part of the film where children poured a drugged mixture of milk down a cat's mouth to anesthetize it, as well as the final portion of the film where boys gather a cleaver, large butcher knives and other sharp instruments, take them in satchels and sacks up a hill with the sailor and anesthetize him with drugged tea. They prepare to mutilate him by putting on surgical gloves and gather closely around him with their knives. Appellant's remarks about "cutting it up" or "cutting it out" evidently mimicked what was being shown in the movie.

Hoehn testified there were portions of the film that were missed because he and appellant were having "sexual relationships." Upon returning from the pool Hoehn performed fellatio on appellant. Hoehn did not remember much about the movie after appellant made his "joke" with the knife he had brought out from the kitchen, because at that point he started to "play with Kerry a little bit...." Hoehn testified that he performed oral sex on appellant's anus "at intervals" while he lay facing the television. Hoehn recalled this was happening toward the end of the movie after the children had drugged the sailor and he was going to sleep. Hoehn stated that by this time his part of the sex act was consummated, and appellant then tried to have anal intercourse with Hoehn, failed, and then masturbated himself to a climax. On cross-examination Hoehn testified that the film ended around 11:45 p.m. and that they left the apartment around 12:00 or 12:05 a.m. for cigarettes. Hoehn returned appellant to the apartments' parking lot around 12:30 a.m. or 12:35 a.m.

Hoehn testified that on the night in question appellant wore a pair of "tennis style-type shorts" and over these a pair of blue pants. Appellant introduced a pair of gym shorts into evidence and asked Hoehn if they were the same color as those appellant wore the night of June 9, 1977. Hoehn replied the ones he saw then had a "blue body and a red stripe around the waist and down the leg." Hoehn also testified on redirect that appellant frequently wore this type of gym short, and that he lounged around in them.

One of the policemen who investigated the murder scene on June 10, 1977, was Lt. Doug Collard of the Tyler Police Department. He viewed the body of the deceased lying on the floor, and testified throughout with the aid of slides made from photographs taken at the scene. The body was nude from the waist down and there were pieces of plaster under and around the body. A pair of shoes, panties and blue jeans lay beside the deceased's feet. The panties had been cut across the crotch and up one side. A stocking was on one leg, while the other was missing and never found. The brassiere and blouse had been cut up the middle and pulled aside, and there were several places in the brassiere and blouse that had been cut through with a sharp instrument. An earring lay next to the deceased's right hand, still attached to the right ear lobe that had been completely torn loose.

The body had been severely mutilated. Lt. Collard described how the right breast had a large stab wound, and that the blood on the body indicated "rub marks" or "smear marks, motion marks." There were multiple wounds in the vaginal area, as well as in the throat area. On the lower right side of the bottom lip, one quarter of the lip was missing, and there was a long laceration from the edge of the mouth into the cheek area. A quantity of hair from the upper right-hand top of the head had been removed. According to Collard, the entire vagina had been cut out, leaving a large cavity that extended deep into the body. The missing part of the lip and the vaginal parts were never found. A small quantity of hair was discovered at the scene, however, the rest was never found. There were also three stab wounds in the back of the deceased.

Lt. Collard deducted that a plaster statue with quantities of plaster broken loose had been used to strike the deceased. There were particles of plaster in the hair of the deceased and on the bed next to a blood stain on the bedspread, indicating the deceased had been lying on the bed when struck by the statue. Lt. Collard found no evidence of a struggle in the bedroom, nor did he find any defensive marks on the deceased that would indicated that she offered any resistance against her attacker.

The physical evidence introduced included the plaster statue, various parts of the deceased's clothing, the bedspread and pillow, a French carving knife, and a pair of scissors.

After qualifying Collard as an expert witness in fingerprint analysis, the State placed in evidence a "faint impression" lifted from the scissors. However, this print was too faint for comparison because at the time of discovery the scissors were covered with blood almost up to the pivot screw, and motion had disturbed the print. Although the police lifted fingerprints from all over the apartment, the only ones that did not match the deceased's or Paula Rudolph's prints were three found on the patio door. Two were inside the patio door, but were insufficiently detailed to make a comparison. The third was found on the outside edge of the patio door about 56 inches above the base of the door. This print depicted the entire middle finger and part of the ring and little fingers of the left hand. Collard testified that he found no dissimilar characteristics between that print and prints taken from appellant when he was taken into custody. In his opinion the print from the patio door belonged to no other person than appellant. It was also Collard's opinion that the print was approximately six to twelve hours old. This means the print could have been left between 8:00 p.m. on June 9, 1977, and 8:00 a.m. the next morning.

Collard also testified that the print was made as the door was being closed, and he concluded that appellant would have been closing the door behind him as he entered the apartment. Collard found a "smear pattern" at the corresponding point where the left thumb would have touched the door.

Dr. V.V. Gonzalez, M.D., a pathology specialist, testified that on June 10, 1977, he examined the body of the deceased at the murder scene at 9:30 a.m. and later performed an autopsy at a funeral home at 11:30 a.m. His observation revealed the following:

Multiple lacerations to the head, with one laceration "rather deeply penetrated to the entire scalp so that the scalp has been exposed and is gaping open." There was an injury to the left eye and massive hemorrhaging underneath the scalp, with multiple contusions, injuries and bruises on the back part of the brain. Dr. Gonzalez theorized that the deceased had been knocked out, and the injuries to the gums with bits of plaster embedded in the teeth indicated that a plaster of paris statue had been used to knock the deceased unconscious. Gonzalez testified that this plaster material was identical to the material of the statue, and that the blow was not enough to kill the deceased.

Dr. Gonzalez also testified that part of the lip had been snipped away by scissors, which had also been used to inflict lacerations on the neck. A large carving knife was probably used to cause a deep cut that severed the internal carotid artery and another that cut the jugular vein. Gonzalez also described four stab wounds to the back, two of which lacerated the diaphragm. One completely severed the tenth rib and lacerated the diaphragm, while another lacerated part of the lung. Because of the wide laceration of the diaphragm, the spleen, stomach and part of the intestine were located up in the left chest cavity, and approximately 500 cc. of blood had oozed into the left pleural cavity through these wounds.

Gonzalez testified there were three wounds in the pubic region, one of which was three or four inches deep that had

lacerated the left side of the urinal bladder in the pelvic cavity. The pelvic cavity was filled with blood. Dr. Gonzalez testified, "So with this amount of blood, I can assume that this wound was inflicted when this lady was still alive because of the amount of blood that has penetrated through the bladder." There were also multiple lacerations in the perineal region, probably inflicted with scissors, such that:

> "[T]he wall that separates the vagina with that of the rectum is completely lacerated or mutilated so that there is a communication within the vagina wall with that of the pelvic cavity and with that of the rectum."

Multiple "snipping and lacerations" had removed parts of the wall of the vaginal canal, which were not found at the scene. Gonzalez finally testified that three shallow wounds and one deep wound had been inflicted on the right breast, completely transepting the seventh and eighth rib and penetrating the liver. Gonzalez stated, "a sharp edged weapon or knife will be indicative of this type of wound."

The body was in a condition of rigor mortis that would indicate the deceased had been killed between 10 to 12 hours before, plus or minus two or three hours. Death was caused by the cutting of the carotid artery and jugular vein. The lacerations in the vaginal area were so extensive and the bleeding so profuse that the autopsy showed no evidence of semen or acid phosphatase to indicate rape. Gonzalez indicated he was not, however, able to "rule out with definite certainty that rape was performed—."

The State successively called Rodney Dykes, age 13, and Randy Dykes, age 18. Both had visited their Uncle James Taylor at his Embarcadero apartment one or two days before the murder. Appellant had been staying there for about two weeks. Both of the Dykes testified that appellant related that one night he was passing by a window with the curtains open and saw a girl undressing and "playing with herself." [It should be noted that in the film "The Sailor Who Fell From Grace With the Sea" one of the scenes appellant saw, and which was also viewed by the jury, depicted a dark-haired woman sitting undressed before her bedroom mirror, masturbating.] Appellant had pointed the window out to the Dykes, and it was identified as the deceased's bedroom window.

Randy Dykes testified he picked up appellant at about 10:00 a.m. the day after the murder to take him to look for a job. While driving along they heard news on the radio concerning the murder and its investigation. Dykes stated appellant looked "somewhat shocked" when the broadcast came on. The two drove to where the first job application had been filed, but then appellant changed his mind and had Dykes drive him to Jacksonville. Dykes testified that before driving appellant to Jacksonville they stopped at the Embarcadero Apartments where appellant picked up a large grocery bag that was a little less than halfway rolled over. Although Dykes did not see appellant pack any clothes, appellant had indicated he wanted to stop by the apartment to pick up some clothes because he was going to spend the night.

A hearing was held outside the presence of the jury to determine the admissibility of an oral statement made by appellant to Edward Scott Jackson while in Smith County Jail. The trial judge ruled that any statements and conversations had between appellant and Jackson were voluntarily made, and therefore Jackson's testimony was admissible.

Jackson, a 22–year–old inmate of the Smith County Jail, testified in the presence of the jury that he met appellant at the jail in late August, 1977. Jackson testified that between the second and the fifteenth of September he and appellant were looking at a Hustler magazine, when appellant made certain remarks about some of the dark-haired women depicted there. Jackson stated, "He would make a comment like I would like to fuck her hard or this bitch needs her ass kicked—for posing like this." At this point Jackson recalled appel-

lant was acting "like a nut ... He was hiked up," and that "he acted a little crazed, wild." Jackson further testified:

"*I asked* him soon afterwards *if he was guilty of what he was charged with* and he answered my question with a question asked to me was I guilty and I told him, no, and he said, 'Edwards, I trust you, man.' He said, 'I have never told anybody else this so please don't repeat it.' *He told me that he had* —and went further—" (Emphasis supplied.)

Further questioning of Jackson elicited the following:

"A  He said that he killed her and he went further into details.

"Q  Go into those details for the Jury, please?

"A  He said that he had stabbed her in several places. ·

"Q  Did he tell you the places he had stabbed her?

"A  One in particular, he said that he cut along her hairline in between her legs in a V shape and that he gouged her several times.

"Q  Did he tell you where he gouged her?

"A  In her vagina, he said he had cut pieces out. He said he cut some hair from her head. He gested (sic) that—made gestures of stabbing her."

Appellant also told Jackson that upon leaving he thought he had been seen by a young lady.

In his defense appellant called three witnesses, all inmates of the Smith County Jail, to give impeaching testimony about Jackson. Witness Fomby basically testified that Jackson's testimony was self-serving, that he saw this as his "ace in the hole" in order to reduce his charge from murder to involuntary manslaughter. Witness Evans testified that Jackson told him he was not going to tell the truth in the proceeding against Kerry Cook. Finally, witness Sewell stated that Jackson had told him "that they had not made a deal and that he was going to get a deal before he would ever testify." The jury, by its verdict, chose to give this testimony little or no weight. Furthermore, the trial judge instructed the jury to disregard the testimony of a fourth witness, to which appellant made no objection.

After deliberations, the jury returned a general verdict of "guilty of the offense of capital murder as charged in the indictment." During the punishment phase of the trial the State brought on 13 character witnesses who were acquainted with appellant's reputation in the community for being a peaceable and law-abiding citizen. Each testified that such reputation was bad.

Lt. Collard testified that appellant had been convicted of theft on October 13, 1973, and sentenced to two years in the Texas Department of Corrections.

Dr. James P. Grigson, a psychiatrist, and Dr. Jerry Landrum, a clinical psychologist, both testified on the issue of future dangerousness. They both concluded that appellant would continue to be a threat to society.

Appellant offered no evidence at the punishment phase of the trial. After hearing argument from both sides, the jury retired to deliberate, returning answers of "yes" to all three special issues under Article 37.071, V.A.C.C.P. The trial court assessed the mandatory death penalty.

Appellant contends that the trial court erred in overruling his pretrial motion to require the State to elect which count of the indictment it expected to prosecute.

The indictment contained six counts of capital murder. It alleged the appellant murdered the deceased while in the course of committing (1) aggravated rape, (2) aggravated sexual abuse, (3) burglary of a habitation with intent to commit aggravated rape, (4) burglary of a habitation with intent to commit aggravated sexual abuse, (5) burglary of a habitation with intent to commit theft, and (6) burglary of a habitation with intent to commit aggravated assault.

Several months before trial the pretrial motion requiring the State to elect was overruled.

In *Franklin v. State*, 606 S.W.2d 818, 821 (Tex.Cr.App.1979) (opinion on original submission), this Court wrote:

"Where only one transaction is charged, and different counts are contained in the indictment to meet possible variations of proof, the State is not required to elect upon such counts. Nor may an election be compelled where different counts charging the same offense are drawn to prevent a variance and there is evidence to support each count. *Floyd v. State*, 164 Tex.Cr.R. 50, 296 S.W.2d 523 (1956); *Smith v. State*, 141 Tex.Cr.R. 387, 148 S.W.2d 844 (1941)."

See also *Williams v. State*, 680 S.W.2d 570, 574 (Tex.App.—Corpus Christi 1984).

"The other three counts of the indictment charge the same acts in more detail and with slight variations. An indictment may contain as many counts charging the same transaction as the drafter deems necessary to meet variations in the proof. *Ex parte Easley*, Tex.Cr.App. 490 S.W.2d 570 ... Where several ways an offense may be committed are set forth in a statute and are embraced in the same definition, are punishable in the same manner, and are not repugnant to each other, they are not distinct offenses, and may be charged in the same indictment." (Citations omitted.) *Jurek v. State*, 522 S.W.2d 934, 941 (Tex.Cr.App. 1975), aff'd 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See V.T.C.A., Penal Code, § 19.03.

■ The Court did not err in overruling the pretrial motion to require the State to elect. It is observed that at the commencement of the trial the State waived and abandoned the count alleging that the murder was committed during the course of committing aggravated sexual abuse.

In at least six of his points of error in one measure or other appellant attacks the sufficiency of the evidence to sustain the allegations of any of the five counts of the indictment submitted to the jury. He contends there is a fatal variance between the allegata and the probata and the conviction cannot be sustained on any count.

In *Bailey v. State*, 532 S.W.2d 316, 322–323 (Tex.Cr.App.1976), this Court wrote:

"In his sixth ground of *error*, appellant contends the trial court erred *in submitting all six counts* of the indictment to the jury, *in that there was no evidence to support three of the counts* ...

"*Where a general verdict is returned and the evidence is sufficient to support a finding under any of the counts submitted, no error is shown.* Hintz v. State, Tex.Cr.App., 396 S.W.2d 411; Cavazos v. State, Tex.Cr.App., 365 S.W.2d 178." (Emphasis supplied.)

See also *McArthur v. State*, 132 Tex.Cr.R. 447, 105 S.W.2d 227 (App.1937). See further *Tapley v. State*, 673 S.W.2d 284, 289 (Tex.App.—San Antonio 1984).

In the instant case each count submitted to the jury differed from the other by alleging a different mode by which the singular offense was committed. The verdict returned was a general one. See Article 37.07, V.A.C.C.P.

Therefore we must determine if any of the counts submitted are supported by evidence to support the general verdict.

■ One of the counts in the indictment submitted alleges that appellant caused the death of deceased in the course of committing burglary of a habitation with intent to commit aggravated assault. The evidence was sufficient to sustain a finding that appellant caused the death of deceased. This is based on Dr. Gonzalez's testimony that deceased had been knocked unconscious, received multiple stab wounds, and was mutilated with a knife and scissors. Paula Rudolph testified she saw appellant in her apartment at the time of the crime. Fingerprint evidence also placed appellant in the apartment within the time the crime was committed. Furthermore, appellant's

oral statements to Jackson revealed how he committed the crime by stabbing the deceased, mutilating her sexually, and removing body parts. Appellant also related how he feared having been seen in the apartment by a young lady.

Appellant claims the State failed to prove the elements of burglary as set forth in V.T.C.A., Penal Code, § 30.02, because it did not show that appellant's entry into the apartment was forced and because the evidence failed to show that entry was made without the effective consent of deceased. Appellant stresses that the door was unlocked to support his contention.

Under the former 1925 Penal Code, Article 1394, the opening of a closed door was sufficient to constitute force and breaking. *Smith v. State,* 491 S.W.2d 678 (Tex.Cr. App.1973). Under V.T.C.A., Penal Code, § 30.02, force and breaking are no longer elements of the offense. Instead, only entry must be shown. See Practice Commentary to V.T.C.A., Penal Code, § 30.02.

The evidence is also sufficient to show that appellant entered the apartment. The record reflects that Paula Rudolph saw appellant in the apartment between 12:35–12:45 a.m. There was expert testimony that appellant's fingerprint was found on the patio door and that it was in such a position that he could only have left it while pulling the door shut as he entered the apartment. Appellant's statements to Jackson also place him inside the apartment.

■ In the indictment the State alleged ownership of the habitation in Paula Rudolph and that she did not consent to the alleged burglary. It is encumbent upon the State to prove ownership and lack of consent as alleged in the indictment. *Araiza v. State,* 555 S.W.2d 746 (Tex.Cr.App. 1977); *Smith v. State,* 638 S.W.2d 476 (Tex.Cr.App.1982). Rudolph testified that the apartment was her habitation, was rented to her and that she lived there with the deceased. She related she did not consent to the burglary by the appellant.

Proof of ownership as alleged in the indictment and a showing of lack of consent by that person will support a conviction even though there are other persons who have an interest in the property or authority to give consent but who do not testify. *Little v. State,* 567 S.W.2d 502 (Tex.Cr.App.1978). Appellant seems to argue that the evidence is insufficient to show lack of consent because the State did not show that the deceased, who lived at the apartment, did not consent to his entry into the habitation. This was a defensive matter which the State was not required to disprove. *Fletcher v. State,* 396 S.W.2d 393, 395–396 (Tex.Cr.App.1965).

Appellant also urges that the State failed to prove that the entry was with the intent to commit the felony offense of aggravated assault.

The question of intent with which a person unlawfully enters a habitation is a fact question for the jury to be drawn from the surrounding circumstances. *Stearn v. State,* 571 S.W.2d 177 (Tex.Cr.App.1978); *Robles v. State,* 664 S.W.2d 91 (Tex.Cr.App. 1984). And the jurors are the exclusive triers of the facts, and judges of the credibility of the witnesses and the weight to be given to the evidence. *Esquivel v. State,* 506 S.W.2d 613 (Tex.Cr.App.1974). And when a question is raised concerning the sufficiency of the evidence the evidence must be viewed in the light most favorable to the jury's verdict. *Combs v. State,* 643 S.W.2d 709 (Tex.Cr.App.1982). The standard for review in both circumstantial and direct evidence cases is whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Wilson v. State,* 654 S.W.2d 465, 471 (Tex.Cr.App.1983) (Opinion on State's Motion for Rehearing).

The evidence, including Lt. Collard's discoveries at the scene and Dr. Gonzalez's autopsy report, etc., clearly show an aggravated assault. Appellant does not question this. Proof of intent may be shown by circumstantial or direct evidence.

Applying the "rational trier of fact" test we conclude, viewing the evidence in the light most favorable to the jury's verdict, that the evidence is sufficient to support the conviction for capital murder while in the course of committing a burglary of a habitation with the intent to commit aggravated assault as alleged in the sixth count of the indictment.

In view of the above and all the evidence, we overrule appellant's points of error concerning the submission of the other counts of the indictment to the jury. See *Bailey*, supra.

■ Appellant complains that the court erred in failing to grant his special requested charge on circumstantial evidence. No error is presented in light of *Hankins v. State*, 646 S.W.2d 191, 199 (Tex.Cr.App. 1981) (Opinion on State's Motion for Rehearing). See also *Penry v. State*, 691 S.W.2d 636, 649 (Tex.Cr.App.1985).

Appellant further argues that the trial court erred when it permitted Edward Scott Jackson to testify before the jury about the oral statements appellant made concerning the alleged offense while both were in the Smith County jail as inmates.

Before the evidence was admitted the trial judge conducted a hearing to determine the voluntariness and admissibility of the statements. The admissibility of the statements turned on the time the statements were made in view of the 1977 amendments to Article 38.22, V.A.C.C.P., which became effective August 29, 1977. Under the 1967 version of Article 38.22, supra, in effect prior to that date, an oral statement made to fellow prisoners was inadmissible and failure to exclude such a statement at trial was reversible error, particularly if the statement was inculpatory. *Easley v. State*, 493 S.W.2d 199 (Tex.Cr. App.1973).

The 1967 version of Article 38.22, V.A.C.C.P., focused on "the oral or written confession of a defendant while the defendant was in jail or other place of confinement or in the custody of an officer." The 1977 version of the statute changed that focus as to an oral statement to "an oral statement of an accused made as a result of custodial interrogation." See and cf. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Section 5 of Article 38.22, supra, as amended, provided:

"Sec. 5. Nothing in this article precludes the admission of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law."

Thus it appears that if the statements were made to Jackson before August 29, 1977, Jackson's testimony was inadmissible, but admissible if made on August 29th or thereafter.

At the hearing to determine admissibility Jackson, who was charged with an unrelated murder, testified he first became acquainted with the appellant in "late August of '77" when appellant was placed in the Smith County jail where Jackson had been an inmate for some time; that appellant had first been placed in a side cell on the sixth floor while he was in the Federal Tank on the same floor; that since he was a trusty at the time he eventually got the jailer to transfer appellant to the Federal Tank. He testified that sometime between September 2 and 5, 1977 the appellant admitted he was guilty of the charge against him and described the details of the offense. Jackson stated that this admission was not made before September 2nd. He gave a sworn statement on October 18, 1977, to the officers about appellant's admissions.

On cross-examination Jackson testified it

was between August 15 to 30, 1977,[1] when appellant was placed in the jail and confined in the side cell for about two weeks before the transfer to the Federal Tank. It was then about two weeks after the transfer that appellant made his admissions. Jackson recalled that appellant had gone to a "hearing" which appellant or other inmates later said was an examining trial and that appellant seemed relieved thereafter because the State's main witness related the man she had seen had silver hair. It was stipulated the examining trial occurred on August 19, 1977. Jackson couldn't remember whether the admissions were made before or after the "examining" trial, and could not remember any other "hearing" that appellant had while they were in the same tank or cell together.

Jackson's sworn statement of October 18th was introduced into evidence at the hearing. In the statement Jackson stated that appellant "had told me this" before Jackson "had to go to court" and upon his return to the cell seemed relieved because of the testimony. Jackson admitted the statement was "saying" appellant's admission came before "that hearing."[2] Jackson stated, however, that the killing was mentioned again "occasionally" before he (Jackson) was moved out of the same cell several weeks later, but not the details of the killing. Jackson could not recall just when the hearing took place, but the written statement of October 10th reflected that appellant was not moved into the Federal Tank until approximately August 24th.

On redirect examination Jackson reiterated that admissions were made to him by appellant between September 2nd and September 15th.[3]

Brad Berger, an administrative assistant to the Sheriff, testified that the jail records from June 29 until November 14, 1977, showing which inmates were in which cells were either missing or had not been kept for that period.

This was the evidence before the trial judge who at such hearing was the sole judge of the weight of the testimony and credibility of the witnesses. He may choose to believe or disbelieve all or any part of any witness' testimony. *Holloway v. State*, 691 S.W.2d 608, 614 (Tex.Cr.App. 1984); *Hawkins v. State*, 660 S.W.2d 65, 72 (Tex.Cr.App.1983); *Waller v. State*, 648 S.W.2d 308, 311 (Tex.Cr.App.1983); *Myre v. State*, 545 S.W.2d 820, 824 (Tex.Cr.App. 1977); *Aranda v. State*, 506 S.W.2d 221 (Tex.Cr.App.1974).

■ The trial judge found the statements to have been voluntarily made and admissible in evidence obviously having concluded that the statements were after the effective date of Article 38.22, supra, as amended 1977. There is evidence to support the trial court's action in admitting Jackson's testimony. Appellant's point of error is overruled.

After Jackson testified before the jury appellant called several jail inmates as witnesses in an attempt to impeach Jackson and his denial of a "deal" with the State for his testimony. That, of course, was a matter for the jury who were the trier of the facts, judge of the credibility of the witnesses and the weight to be given to their testimony.

■ Appellant has attached to his brief out of the court affidavits and exhibits to demonstrate Jackson's subsequent retraction of his testimony favors received from the District Attorney's office and that there was a "deal" with the State. None of this material is properly before the court in its present posture. *Pollan v. State*, 612 S.W.2d 594 (Tex.Cr.App.1981); *Garrett v.*

---

**1.** The October 18th statement reflects Jackson's recollection that appellant was first placed in jail on August 10, 1977.

**2.** It is clear that Jackson normally used "court" or "hearing" in his statement and testimony. He was only told that it was an examining trial.

**3.** Earlier on direct examination Jackson had used the dates September 2nd to September 5th.

*State,* 566 S.W.2d 605 (Tex.Cr.App.1978); *Rasberry v. State,* 535 S.W.2d 871 (Tex.Cr. App.1976); *Grant v. State,* 505 S.W.2d 259 (Tex.Cr.App.1974).

Appellant contends the court "erred in overruling and admitting evidence of extraneous offenses on the part of the appellant." Appellant calls attention to a particular motion in limine he filed to restrict the State from offering into evidence extraneous offenses. The motion was overruled. Appellant now complains that through the testimony of Robert Hoehn that certain homosexual acts on his part were improperly admitted as extraneous offenses. He calls attention to 22 places in Hoehn's trial testimony where such acts were described. To none of this testimony was there any trial objection addressed, and nothing is preserved for review. *Bouchillon v. State,* 540 S.W.2d 319 (Tex.Cr.App.1976).

"Reliance on a motion in limine will not preserve error. A defendant must object on the proper grounds when the evidence is offered at trial. *Harrington v. State,* 547 S.W.2d 616 (Tex.Cr.App.1977); *Lopez v. State,* 535 S.W.2d 643 (Tex.Cr.App. 1976). The reason for this is that a judge is often not in a position to decide on the admissibility of evidence prior to the beginning of trial." *Romo v. State,* 577 S.W.2d 251, 252 (Tex.Cr.App.1979). See also *Gonzales v. State,* 685 S.W.2d 47, 51 (Tex.Cr.App.1985), *Woolls v. State,* 665 S.W.2d 455, 470 (Tex.Cr.App.1983); *Armitage v. State,* 637 S.W.2d 936 (Tex.Cr.App. 1982).

Appellant's point of error is overruled.

In another point of error appellant contends that the trial court erred in allowing the State to argue to the jury outside the record. He then lists nineteen separate instances under the one point of error. The record shows that in fifteen of the instances listed where the prosecutor referred to the appellant as "killer," "pervert", etc., there was no objection at all. "Without a timely and specific objection being made, no error is preserved for our review." *Vela v. State,* 516 S.W.2d 176

(Tex.Cr.App.1974). We examine the four remaining instances where objections were made.

■ In the first the prosecutor stated, "That little pervert wanted to look through that window, he wanted to ..." Appellant's counsel interrupted, "I object to him testifying." The prosecutor responded he was talking about the evidence in the record. The court then stated, "Counsel stay within the record, please." The prosecutor continued his argument. No further relief was requested by the appellant. To preserve error for review a defendant must pursue his objection until an adverse ruling is received. *Penry v. State,* 691 S.W.2d 636 (Tex.Cr.App.1985); *Stevens v. State,* 671 S.W.2d 517, 521 (Tex.Cr.App.1984); *Lewis v. State,* 664 S.W.2d 345, 349 (Tex. Cr.App.1984); *Euziere v. State,* 648 S.W.2d 700, 703 (Tex.Cr.App.1983); *Stoner v. State,* 585 S.W.2d 750, 755 (Tex.Cr.App. 1979). No error is presented for review.

In the second remaining instance the prosecutor referred to appellant's "demon cult friends." The court in effect sustained appellant's "out of the record" objection, instructed the jury to disregard the argument "outside the record" and admonished the prosecutor to stay inside the record. No further relief was requested. The next instance involved the prosecutor referring "to the freaks and perverts of the world." The court sustained appellant's objection and instructed the prosecutor to stay within the record. No further relief was requested. There was no pursuit of an adverse ruling. Nothing is presented for review. See *Stoner v. State,* supra; *Earnhart v. State,* 582 S.W.2d 444, 449 (Tex.Cr. App.1979); *Hanner v. State,* 572 S.W.2d 702, 707 (Tex.Cr.App.1978).

In the final remaining instance the prosecutor in discussing the evidence stated, "I wouldn't be surprised if he didn't eat those body parts." The court immediately sustained appellant's "speculation out of the record" objection and instructed the jury to "disregard the last remark of the prosecuting attorney." No motion for mistrial was

made and no further relief was requested. Nevertheless, appellant contends the argument was designed to prejudice and inflame the minds of the jurors, and the instruction was not sufficient to cure the error. He cites *Simpson v. State*, 493 S.W.2d 793 (Tex.Cr.App.1973), and *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974). *Simpson* is distinguishable because the defendant pursued his objection to an adverse ruling when the trial judge overruled his motion for mistrial. In the instant case there was no motion for mistrial, no pursuit of an adverse ruling. In *Boyde*, the prosecutor persistently disregarded the trial court's admonitions to stay within the record and attempted to circumvent rulings in both the presentation of evidence and argument to the jury. *Boyde* is thus distinguishable from the instant case on the facts. No error was preserved for review.

Appellant further contends he was denied a speedy trial under the federal and state constitutions.[4]

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court established a balancing test for ascertaining whether the right to speedy trial has been denied, based on at least four criteria:

(1) the length of delay;

(2) the reason for delay;

(3) the accused's assertion of his right;

(4) the prejudice to the accused.

It has long been noted that none of these four criteria have "talismanic qualities," and that a showing of prejudice is not *sine qua non* to demonstrating a denial of the right of speedy trial. *Davison v. State*, 510 S.W.2d 316, 319 (Tex.Cr.App.1974). *See also Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). These factors are to be considered together, and each case is to be judged on an *ad hoc* basis. *Barker*, at 530, 533; *see also United States v. Eight Thousand Eight Hundred and Fifty Dollars*, 461 U.S. 555, 103

S.Ct. 2005, 76 L.Ed.2d 143 (1983); *Phillips v. State*, 650 S.W.2d 396, 404 (Tex.Cr.App. 1983).

According to *Barker v. Wingo*, supra, the length of delay serves in part as a "triggering" mechanism to determine if the right has been violated.

"The delay that can be tolerated varies with the circumstances of each case. For example, a delay of nine months may be 'wholly unreasonable' under the circumstances. *Barker*, supra, 407 U.S. at 528, 92 S.Ct. at 2191. Conversely, delays of two years and seven months, *McCarty v. State*, 498 S.W.2d 212, 215 (Tex.Cr. App.1973) and three years and eight months, *Swisher v. State*, 544 S.W.2d 379, 381 (Tex.Cr.App.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), have been acceptable." *Flores v. State*, 625 S.W.2d 44, 46 (Tex. App.—San Antonio, 1981, no writ).

In the instant case there was a delay of less than eleven months from the date of arrest on August 5, 1977, and the date of trial on June 22, 1978. This delay does not *per se* show a denial of the right to speedy trial. *Davison*, supra.

Secondly, the reason for delay was exacerbated by no less than forty-four motions filed by appellant on January 9, 1978, evidencing that appellant was not ready for trial. There is no evidence that the prosecution or trial court deliberately delayed bringing the case to trial. Thirdly, there is no evidence beyond the two motions for speedy trial filed with the district clerk that appellant asserted his right to a speedy trial by requesting hearings to present evidence on the matter. Finally, appellant has made no showing of prejudice or harm to him as a result of any delay. Although appellant's bail was denied, this was within the trial judge's discretion and no evidence is before us to show an abuse of that discretion. *See* Articles 1.07 and 16.15, V.A.C.C.P.

In two points of error, contained in a supplemental brief, appellant complains of

---

**4.** Article 32A.02, V.A.C.C.P., is not applicable to cases pending on July 1, 1978 as the instant

case. *Wade v. State*, 572 S.W.2d 533, 535 (Tex. Cr.App.1978).

the trial court's action in permitting Drs. James Grigson, a psychiatrist, and Dr. Gerald Landrum, a psychologist, to testify on the issue of further dangerousness, Article 37.071(b)(2), V.A.C.C.P., at the penalty stage of the trial. Appellant relies upon *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a Texas case.

The Supreme Court, in *Estelle v. Smith*, supra, speaking through Chief Justice Burger, held that where prior to the in-custody psychiatric examination ordered by the court to determine the defendant's competency to stand trial the defendant had not been warned that he had the right to remain silent, and that any statement made could be used against him at the sentencing proceeding, admission at the penalty stage of a capital felony trial of a psychiatrist's damaging testimony on the crucial issue of future dangerousness violated the Fifth Amendment privilege against compelled self-incrimination because of a lack of appraisal of rights and a knowing waiver thereof, the death penalty imposed could not stand.

The Court further held that the Sixth Amendment's right to counsel was violated where defense counsel was not notified in advance that the psychiatric examination would encompass the issue of future dangerousness and there was no affirmative waiver of the right to counsel.

It must be remembered that both the Fifth and Sixth Amendments are applicable to the states by virtue of the Fourteenth Amendment. See *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Pointer v. State*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

In *Estelle v. Smith*, supra, the Dallas County district judge, on his own motion, appointed Dr. James Grigson to examine the defendant on the issue of his competency to stand trial. See Article 46.02, V.A.C.

C.P. Dr. Grigson examined the defendant without giving any warnings regarding his Fifth Amendment privilege against self-incrimination and did not notify the defense counsel that the psychiatric examination would encompass the issue of the defendant's future dangerousness, nor was the defendant accorded the assistance of counsel in determining whether to submit to such examination, etc.

After the examination, Dr. Grigson reported to the court that Smith (the defendant) was competent to stand trial. The case went to trial with no issue being raised as to the defendant's competency to stand trial or as to the defensive issue of insanity at the time of the alleged offense. After Smith was convicted at the guilt stage of the bifurcated trial of the capital murder, Dr. Grigson was called by the State at the penalty stage of the trial to testify that, based upon his examination, he considered the defendant Smith a severe sociopath who would commit violent acts in the future "if given the opportunity to do so." The jury subsequently returned affirmative answers to the special issues submitted under Article 37.071(b), V.A.C.C.P., and the trial court assessed the death penalty on appeal. The conviction was affirmed by this Court in *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976).

Having exhausted his state remedies, Smith sought federal habeas corpus relief and prevailed on the contentions identical to those raised at trial by this appellant in the instant cause. *Smith v. Estelle*, 445 F.Supp. 647 (N.D.Texas 1977). The Court of Appeals for the Fifth Circuit affirmed though modifying the decision. *Smith v. Estelle*, 602 F.2d 694 (5th Cir.1979). Subsequently the United States Supreme Court affirmed the Fifth Circuit opinion as earlier noted.

In affirming the lower court in the said *Smith* case, the Supreme Court noted that Smith's future dangerousness was a critical issue at the penalty stage of the capital murder trial, and one upon which the State had the burden of proof beyond a reasonable doubt [See Article 37.071(b) and (c),

V.A.C.C.P.]; that the State, to meet its burden, used Smith's own statements unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty.[5]

Thus, the United States Supreme Court held that both the Fifth and Sixth Amendments of the United States Constitution are violated by a doctor's testimony on future dangerousness at the penalty stage of the trial when the opinion is based on questioning of a defendant in custody who is represented by counsel and the questioning is conducted without prior warning on the Fifth Amendment privilege and without opportunity for advice of counsel.[6]

In the instant case the facts surrounding the examination by Dr. Grigson were not

---

5. The statements were made to the psychiatrist in what was supposedly a pretrial examination to determine competency to stand trial.

6. In *Smith* the Supreme Court wrote:
"In *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Court acknowledged that 'the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.' *Miranda* held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' *Id.,* at 444, 86 S.Ct. at 1612. Thus, absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used against the individual in court.' *Id.,* at 467–469, 86 S.Ct., at 1624–1625. The purpose of these admonitions is to combat what the Court saw as 'inherently compelling pressures' at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of foregoing it, which is the prerequisite for 'an intelligent decision as to its exercise.' *Ibid.*

"The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. Respondent was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a post-arrest custodial setting. During the psychiatric evaluation, re-

spondent assuredly was 'faced with a phase of the adversary system' and was 'not in the presence of [a] person[ ] acting solely in his interest.' *Id.,* at 469, 86 S.Ct. at 1625. Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.

"The Fifth Amendment privilege is 'as broad as the mischief against which it seeks to guard,' *Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892), and the privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.' *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–1494, 12 L.Ed.2d 653 (1964). We agree with the Court of Appeals that respondent's Fifth Amendment rights were violated by the admission of Dr. Grigson's testimony at the penalty phase."

"A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness. If, upon being adequately warned, respondent had indicated that he would not answer Dr. Grigson's questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose. In such circumstances, the proper conduct and use of competency and sanity examinations are not frustrated, but the State must make its case on future dangerousness in some other way.

" 'Volunteered statements ... are not barred by the Fifth Amendment,' but under *Miranda v. Arizona,* supra, we must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, respondent's state-

well developed. Appellant's counsel asserted in colloquy that appellant was taken out of the Smith County jail at the order of the district attorney and taken to Dallas for an examination by Dr. Grigson without notice to counsel and without court order. Dr. Grigson did testify he examined the appellant in the hospital division of the Dallas County jail, that he knew of no court order, and had or would bill the District Attorney of Smith County for his services. There was no showing that *Miranda* warnings were given to the appellant or that Dr. Grigson informed him that the examination was for the purpose of determining his further dangerousness.

Before Dr. Grigson testified appellant objected on the ground that his "right to

ments of Dr. Grigson were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them. *Id.,* [384 U.S.] at 478, 86 S.Ct., at 1630. These safeguards of the Fifth Amendment privilege were not afforded respondent and, thus, his death sentence cannot stand." (Footnotes omitted.)

In discussing the Sixth Amendment contention, the Supreme Court in *Smith* wrote:

"When respondent was examined by Dr. Grigson, he already had been indicated (sic) and an attorney had been appointed to represent him. The Court of Appeals concluded that he had a Sixth Amendment right to the assistance of counsel before submitted to the pretrial psychiatric interview. 602 F.2d, at 708–709. We agree.

"The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense.' The 'vital' need for a lawyer's advice and aid during the pretrial phase was recognized by the Court nearly 50 years ago in *Powell v. Alabama,* 287 U.S. 45, 57, 71, 53 S.Ct. 55, 60, 65, 77 L.Ed. 158 (1932). Since then, we have held that the right to counsel granted by the Sixth Amendment means that a person is entitled to the help of a lawyer 'at or after the time that adversary judicial proceedings have been initiated against him ... whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' *Kirby v. Illinois,* 406 U.S. 682, 688–689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion); *Moore v. Illinois,* 434 U.S. 220, 226–229, 98 S.Ct. 458, 463–465, 54 L.Ed.2d 424 (1977). And in *United States v. Wade,* 388 U.S. 218, 226–227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967), the Court explained:

"'It is central to [the Sixth Amendment] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.' (Footnote omitted.)

See *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v.*

*United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). See also *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

"Here, respondent's Sixth Amendment right to counsel clearly had attached when Dr. Grigson examined him at the Dallas County Jail, and their interview proved to be a 'critical stage' of the aggregate proceedings against respondent. See *Coleman v. Alabama,* 399 U.S. 1, 7–10, 90 S.Ct. 1999, 2002–2004, 26 L.Ed.2d 387 (1970) (plurality opinion); *Powell v. Alabama, supra,* 287 U.S., at 57, 53 S.Ct., at 60. Defense counsel, however, were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed.

"Because '[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege,' the assertion of that right 'often depends upon legal advise from someone who is trained and skilled in the subject matter.' *Maness v. Meyers,* 419 U.S. 449, 466, 95 S.Ct. 584, 595, 42 L.Ed.2d 574 (1975). As the Court of Appeals observed, the decision to be made regarding the proposed psychiatric evaluation is 'literally a life or death matter' and is 'difficult ... even for an attorney' because it requires 'a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing.' 602 F.2d, at 708. It follows logically from our precedents that a defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.' *Powell v. Alabama, supra,* 287 U.S., at 69, 53 S.Ct., at 64.

"Therefore, in addition to Fifth Amendment considerations, the death penalty was improperly imposed on respondent because the psychiatric examination on which Dr. Grigson testified at the penalty phase proceeded in violation of respondent's Sixth Amendment right to the assistance of counsel." (Footnotes omitted.)

counsel" had been violated and he had been deprived of the effective assistance of counsel. The objection was overruled.

Dr. Grigson testified he made a complete psychiatric examination in an hour and a half and found appellant to have an antisocial personality disorder, which is not an illness or sickness, that appellant was a severe sociopath. He expressed the opinion that "from a medical psychiatric standpoint probability" appellant will "continue to behave and act in a way that does represent a very serious threat to the people within our society."

■■■ While the exact time of the examination is not clear from the record, it appears that it took place after appellant had been formally charged or indicted. Thus his right to assistance of counsel had attached. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). While the attachment of that right does not encompass the right to have counsel actually present during the examination, *Estelle v. Smith*, supra, does mean that appellant's counsel should have been informed that the examination would encompass the issue of future dangerousness. Additionally, the attachment of the right to counsel meant that appellant could have consulted with his attorney prior to the examination by Dr. Grigson. There is nothing to indicate that appellant gave a knowing, intelligent, and voluntary waiver of his right to counsel, and a waiver will not be presumed from a silent record.

Thus there would appear to be violations of both appellant's Fifth and Sixth Amendment rights at the penalty stage of the instant capital murder trial by the admission of Dr. Grigson's testimony.

If it could be argued that appellant's objections were not sufficient, it is observed that he did object to Dr. Grigson's testimony on the "right to counsel" basis preserving his Sixth Amendment error. As to the Fifth Amendment error, attention is called to footnote 19 of *Smith v. Estelle*, 602 F.2d 694, 702 (5th Cir.1979), where it

was held that failure to object was excused since "Texas courts" had interpreted Fifth and Sixth Amendments to permit such testimony like Dr. Grigson's [in *Smith*] and there was an apparent futility in objecting to an alleged constitutional violation. In footnote 12 of *Estelle v. Smith*, supra, the Supreme Court adopted the reasoning of the Fifth Circuit as to the claimed Fifth Amendment violation.

Further, the 1981 opinion in *Estelle v. Smith*, supra, has been held to be retroactive. *Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981); *White v. Estelle*, 720 F.2d 415 (5th Cir.1983); *Muniz v. Procunier*, 760 F.2d 588 (5th Cir.1985), cert. denied, *McCotter v. Muniz*, 474 U.S. 934, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *Jones v. McCotter*, 767 F.2d 101 (5th Cir.1985). And this Court has applied the decision retroactively as to both Fifth and Sixth Amendment violations. See, e.g., *Thompson v. State*, 621 S.W.2d 624 (Tex.Cr.App.1981); *Fields v. State*, 627 S.W.2d 714 (Tex.Cr.App.1982); *Ex parte Demouchette*, 633 S.W.2d 879 (Tex.Cr.App.1982); *Ex parte English*, 642 S.W.2d 482 (Tex.Cr.App.1982); *Ex parte Chambers*, 688 S.W.2d 483 (Tex.Cr.App. 1984).

And it has been said, "[W]here a defect of constitutional magnitude has not been established at the time of the trial, the failure of counsel to object does not constitute waiver." *Ex parte Chambers*, 688 S.W.2d, supra at 486 (Campbell, J., concurring); *Cuevas v. State*, 641 S.W.2d 558, 563 (Tex.Cr.App.1982); *Ex parte Sanders*, 588 S.W.2d 383 (Tex.Cr.App.1979), and cases there cited.

■■ Appellant did not waive his claimed violations by offering psychiatric evidence either at the guilt or penalty stage. See *Estelle v. Smith*, supra, 101 S.Ct. at 1878. See also *Battie v. Estelle*, supra, 655 F.2d at 702.

Before turning to the question of whether the error in admitting Dr. Grigson's testimony could be harmless, the testimony

of Dr. Jerry Landrum must be noted. Appellant complains of Dr. Landrum's testimony on the same basis as Dr. Grigson's.

It is observed that there was no trial objection to Dr. Landrum's testimony on the basis now urged on appeal. Here, as with Dr. Grigson's testimony, the facts surrounding the examination, etc., are meager. Dr. Landrum, a clinical psychologist, testified that he worked full time at the Rusk State Hospital from 1969 through 1976. Without dates being established, Dr. Landrum testified he had examined the appellant, and gave testimony much the same as Dr. Grigson, and he expressed the opinion that "it is likely that he will be a continuing threat to society" and "would have a high probability of acting out in an aggressive and harmful manner." Dr. Landrum testified that at the time of his examinations there had been multiple drug abuse by appellant including extensive use of marihuana, acid, speed, downers and alcohol. He observed that appellant had a sexual deviation, pansexuality, which manifested itself in violence and aggression against humans. The doctor expressed the opinion there was no chance of rehabilitation for the appellant. On cross-examination it was established that the doctor had observed the appellant "throughout this time" and his last examination of the appellant was at Rusk State Hospital about or "within the last three years" of his June 1978 trial testimony. It is clear that Dr. Landrum examined appellant prior to the alleged offense, the indictment, the appointment of counsel, etc., and was not in connection with testifying as to the issue of future dangerousness. *Estelle v. Smith,* supra, is not applicable to Dr. Landrum's testimony. The testimony was properly admitted.

Turning to the question of harmless error, we observe that in *Satterwhite v. State,* 726 S.W.2d 81 (Tex.Cr.App.1986), there was no question that Dr. Grigson's testimony on future dangerousness at the penalty stage of Satterwhite's trial was tainted by Sixth Amendment error. However, the same testimony, not shown to be tainted, elicited from a psychologist, as in the instant case, and there was evidence of four prior felony convictions, other unadjudicated extraneous offenses involving a shooting, etc., the testimony from eight (8) peace officers that the defendant's reputation for being a peaceful and law-abiding citizen was "bad" as well as the testimony from the guilt stage of the trial which was before the jury. See *Bravo v. State,* 627 S.W.2d 152 (Tex.Cr.App.1983; *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979).

In *Satterwhite,* this Court wrote:

"We conclude that the properly admitted evidence was such that the minds of an average jury would have found the State's case sufficient on the issue of the 'probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society' even if Dr. Grigson's testimony had not been admitted. The admission of the testimony was harmless error beyond a reasonable doubt. *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980)."

In the instant case the tainted testimony from Dr. Grigson was also in evidence from an untainted source, Dr. Landrum. And at the penalty stage there was also testimony from 13 witnesses who testified that appellant's reputation for being a peaceable and law-abiding citizen was bad. Texas Ranger Bob Prince had known appellant about three and a half years. Pete Menefee, the District Attorney for Cherokee, had known appellant "a couple of years." Danny Stallings, Sheriff of Cherokee County, had known appellant and his family all his life, and known appellant "personally" for "a couple of years." Archie Cook, Chief of Police of Jacksonville, had known the appellant for seven years. Sgt. Robert Jackson of the Jackson Police Department had known the appellant eight or nine years. John Wigman, Constable of Precinct No. 6 or Cherokee County, had known appellant about six years.

E.G. Osburne, Principal at the Jacksonville High School, had known appellant

since 1972. Ray Darvey, Vice Principal at the Jacksonville High School, had known appellant for some six years since he became a student at the high school. Homer Kennedy, owner of the Kennedy Chevrolet–Pontiac Company in Troup, had known appellant for about four years. Howard Chastine, an employee at the same automobile company in Troup had also known appellant for about four years. Connie Stovall, owner of an Exxon service station in Jacksonville, had known appellant for five years. H.C. Plunk, car salesman at Livezey Chevrolet Company in Jackson, had known appellant for four years. Bob Bailey, a wholesale gasoline dealer, had known appellant over three years. In addition there was record evidence of appellant's 1973 felony theft conviction in the Second District Court.

It is true, of course, that in answering the special issues under Article 37.071, V.A.C.C.P., including the issue of future dangerousness, the jury may consider all of the admitted evidence at the first or guilt stage of the bifurcated trial. *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1981), and cases there cited; *Russell v. State*, 598 S.W.2d 238, 254 (Tex.Cr.App.1980); *Russell v. State*, 665 S.W.2d 771, 781 (Tex.Cr.App. 1983). It has been said that the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the second special issue (future dangerousness) submitted at the penalty stage of a capital murder trial. *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978). See also *Carter v. State*, 717 S.W.2d 60 (Tex.Cr. App.1986); *Fierro v. State*, 706 S.W.2d 310, 319 (Tex.Cr.App.1986); *Bush v. State*, 697 S.W.2d 397, 399 (Tex.Cr.App.1985).

The facts, already described, show a brutal vicious murder in which the victim was mutilated and her vagina cut from her body.

As in *Satterwhite*, we conclude that, even if Dr. Grigson's testimony had not been admitted, the properly admitted evidence was such that the minds of an average jury would have found the State's case sufficient on the issue of future dangerousness. The admission of Dr. Grigson's testimony was harmless beyond a reasonable doubt.

The judgment is affirmed.

CLINTON, Judge, dissenting.

The offense was committed during early morning hours of June 10, 1977, and the record reflects that the case gained instant notoriety. No doubt and commendably, members of the law enforcement community, including the district attorney, were anxious to solve the crime, and are convinced they succeeded. But to me, at least, there are some troublesome aspects in this cause.[1]

The record reflects that not until August 4, 1977 did officers believe there was probable cause to arrest appellant. Just the day before, according to the complaint or information made by Detective Eddie Clark, Sgt. Doug Collard had concluded that latent fingerprints he lifted from outer patio door frame were left by appellant; though Detective Clark related that he had interviewed Paula Rudolph on June 10, 1977, and summarized what she reported about seeing a man and hearing him leave, nowhere does he indicate that she could identify him. Detective Clark obtained a warrant to arrest appellant, and it was executed the next day. Within thirty days Edward Scott Jackson and appellant were in the same tank. Immunity was granted

---

1. At the outset it must be noted that the State introduced 109 exhibits, some 70 of them being slide photographs of every pertinent detail of the crime scene, as well as a blueprint of the apartment complex and grounds and a diagram of the floor plan of apartment no. 169; appellant offered ten exhibits. None was reproduced in the record forwarded to this Court, so we were at once disadvantaged in relating constant testimony that "this is there (indicating)" to the exhibits. To correct those deficiencies in the record we ordered up the exhibits and they have now been examined. Appended hereto is State's Exhibit 101, a floorplan of her apartment Paula Rudolph shared with deceased.

several persons. An indictment was returned September 19, 1977. Transactional immunity was granted to James B. Taylor, uncle of appellant. A "reindictment" was presented November 7, 1977. Trial commenced June 5, 1978. Appellant had recently turned twentytwo.

The evidence may be sufficient when one picks and chooses certain items, but a rational reviewer of all facts is left with serious questions whether a rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Paula Rudolph opened an unlocked front door after midnight; from entry area to her left she saw door to bedroom of deceased was open and silhouetted in very bright light overhead was a human figure; it turned ("for one split second there we were face to face"), whirled out of sight and closed the bedroom door. The figure was wearing what appeared to be "white shorts," "a definite band of white across the lower torso into the top of the leg." However, Robert Hoehn testified appellant never wore white around him, and left his car wearing long dark blue pants, but under them were sport shorts with a *"blue* body and a *red* stripe around the waist and down the leg." [2]

In her own bedroom, Rudolph heard sliding patio door to the rear of the apartment open and close, assuming the figure was *leaving*. Lt. Doug Collard said fingerprints on the door were made when appellant *entered* and closed the patio door behind him; if done contemporaneously surely it made same sliding noise Rudolph heard, alerting fully clothed deceased. But he also testified that when first attacked deceased was lying on a "bed" (actually a couch, see *post*, n. 8.), there was no evidence of a struggle nor any indication that deceased offered resistance against her at-

tacker. Usually detectives take that to mean a victim knows her assailant.

The most *prejudicial* evidence in reels and reams was given by Hoehn. Not mentioned in the opinion of the Court is the fact that to obtain his testimony the State granted Hoehn immunity.

The most *incriminating* testimony came from Edward Scott Jackson, and a clear inference from arrangements made to place appellant in the same tank with Jackson and the latter's taking the initiative with appellant is that he had a personal stake in the matter. His memory about the conversation was much better than his recollection of the more important point of law, that is, when did the conversation take place. On that score, jail records that may have helped refresh his recollection or cast light on the subject "were either missing or had not been kept for that period." [3]

Manifestly, then, there are certain matters of critical importance, and to evaluate them intelligently one must identify the principals and place them in a setting of time and place as of June 9, 1977.

Paula Rudolph is a thirtysix year old widow. She has resided in Apartment No. 169 for almost two years, and works as a Tech Processing Librarian at Texas Eastern University. Her supervisor is James Mayfield, Dean of the Learning Resource Center; in his early forties and married, he and his wife have three children. Linda Jo Edwards is twentyone, a secretary in the English Department, School of Humanities, who earlier had worked under the supervision of Rudolph and, in turn, Dean Mayfield.

Edwards "had a lot of life to her and she had a lot of intelligence, but she didn't have a lot of experience ... and was impressed with the attention of someone like she had never known before," namely, Dean May-

---

**2.** All emphasis is mine throughout unless otherwise noted.

**3.** While not properly before the Court, as the majority opinion notes, there is material extant revealing that Jackson recanted his testimony,

was at the time the beneficiary of favors bestowed by the district attorney and did indeed have a "deal" with the State. See *post*, at p. 954.

field, according to Rudolph. They have been emotionally involved for some eighteen months, and are having an affair. Formerly living in the Bullard area of Tyler and once married but divorced, at one point in time for "probably a couple months, a few months," Edwards stayed with the Mayfields in their home. Mayfield visited Rudolph in her apartment "a few times" and she saw him around the complex another time. Rudolph elaborated:

"They were—he was in the parking lot close to the tennis courts coming away from the tennis courts."

For about two weeks Edwards has been a guest of Rudolph, looking for her own apartment; Dean Mayfield has been in once during that period.

Rudolph arrived home on the evening of June 9 about 8:30 p.m. to find the front door locked and no one there; while she was eating, Edwards came in around 9:30, and they chatted until Rudolph said she was going to take a shower; Edwards said she would go over to the tennis courts "to see if there was anyone there to play with." Returning at approximately 10:15, Edwards related that she "had run into some old friends," a couple, and a second man with the couple. She gave Rudolph an impression that the three of them lived in the apartments and that she was going back to play tennis with them because they were to give her some pointers. Rudolph left at 10:30. In a few minutes Hoehn would arrive at Taylor's apartment with beer for appellant.

### Eyewitness Identification

The next day Rudolph was interviewed by a police lieutenant and gave a sworn statement which was tendered jointly by the parties on *crossexamination* and read into evidence by Rudolph, herself. Therein she recounted the information summarized above and the following account of activity and observations after she returned about

12:35 to 12:45 a.m., and opened unlocked front door to her apartment (which she did not then or later lock and Lt. Collard would say had no indication of forcible entry)—practically at same time Hoehn testified he let appellant out entrance to a parking lot in front of the complex and declined an invitation to come in with appellant.

"... I pushed the door open and stepped in and noticed a figure jump behind the door in Linda's room. I remember the figure had silver hair cut in a medium touching the ears fashion that men wear. The body was that of a Caucasian with a tan wearing white shorts of some fashion. I do not know if they were briefs, walking shorts, tennis shorts, or exactly what style. The figure was sleek and slender and he moved quickly behind the door in Linda's room and closed it. I knew that Linda had been seeing my boss, Jim Mayfield.

My first impression on seeing the figure was that it was he, even though I could not see the facial features nor hear him speak. I felt that the best thing for me to do was to go to my room and exercise discretion. I called out, 'Don't worry, it's only me.' I went straight to my room. After getting through my room in just a few moments, less than five minutes, I'm sure, I heard the patio doors open and close. I decided to go into the kitchen and get me a cup of coffee and unplug the pot but decided not to since Linda might be in the living room or on the patio with the person I assumed to be Jim Mayfield.

I got into bed at approximately 12:45. I got back up a few minutes later to set the alarm and it was 12:50. I then went back to bed. I did not hear Linda or anyone else speak during the time I arrived home until I went to sleep. I did hear the television in Linda's room or it might have been the radio.

I woke up at 6:30 A.M. this morning but did not get up until 7:00 A.M. * * * *"4

Faced with that statement, the prosecution and Rudolph fashioned her direct testi-

---

**4.** Soon she went to the kitchen to make coffee; returning to her bedroom, she looked out through patio door and noticed wooden gate in

rear patio fence was open—an "extremely unusual" event, since she insisted it be kept closed—and also immediately noticed her cat

mony to elaborate on those moves and observations in such manner as to demonstrate her impression that the figure is Dean Mayfield was erroneous.[5]

Rudolph explained from her position in entry foyer to center of bedroom she had "approximately one foot field of vision;" she moved in a dark area looking into an intensely bright lighted area from high wattage bulbs in an overhead fixture; she described the torso of the figure. Then after answering affirmatively whether "this person who you saw in [Edwards'] bedroom [is present in the courtroom]" and being asked to do so, she pointed to appellant, described what he was wearing and where he was seated. Then the following occurred:

"Q. Do you base your identification of this Defendant as the person who you saw in your roommate's [sic] bedroom, do you base this on what you recall from seeing late in the night of June 9th or early morning on June 10, 1977?

A. Yes. I do. *He fits.*

[DEFENSE COUNSEL]: Your Honor, I object to the non-responsive part on the witness and ask the Court to instruct her not to do so anymore.

THE COURT: The Court will sustain the objection. The Jury is instructed to disregard that portion of the witness' which was 'he fits". The witness will please be as responsive to the question asked of you. . . .

Q. Miss Rudolph, there was a non-responsive answer to the extent that you said 'he fits.' Do you mean that he fits the description of the physical characteristics which you recall from the night, is that what you mean?

was not in the apartment as she usually is. Looking for her cat she pushed unclosed door to Edwards bedroom and saw her bloody arm. Shortly after Rudolph called police the cat scratched the patio door to be let in. The door was not locked.

5. The fact of the matter is she had described Mayfield "from the shoulders up" almost perfectly. As she would later testify in response to several questions:

A. Yes. That is what I mean."

Her sworn statement ended with a recitation that she had read it, it is true and correct and that she "will testify to such facts in Court if asked to do so." After she finished reading it to the jury, the first question was whether her "mind has changed" about the figure having "silver hair," and she allowed it had. In response to further questions, she stated that appellant's hair was "very black," "not speckled with gray" and "not silver;" that his was a "broad face," Mayfield's "probably sharper than his," and that by "broad face" she meant "the shape of it," because: *I did not and never said I saw the figure distinctly enough to see features.*"

Counsel for appellant then returned to her partially nonresponsive answer that "he fits," and what she agreed with the prosecutor she meant by that. To his questions she responded that she had talked about her description of the figure with relatives, numerous police officers and prosecuting attorneys; she agreed that she had not spoken with defense counsel. Counsel drew her attention to an August 19 examining trial and September 20 bail hearing at which she testified, knowing that appellant was there as accused. Regarding prior testimony given by her then to the effect that "this person had white hair, silver hair or whatever," she said that had been her testimony, adding that "this person refers back to the person I thought I recognized," namely, Jim Mayfield. As to "what has changed [her] mind" since then, Rudolph offered an explanation, *viz:*

"For one thing, I think when I made the statement . . . , it was within a few hours

"From the shoulders up he is a very slender man, sharped face and wears glasses. He has very thin silver hair, gray hair. I don't know the color of his eyes. * * * [In June 1987 his style of haircut] was a modern haircut, straight, . . . . about even around the ears. It's not short conservatively, it's semi-mod conservative, conservative mod." Hoehn testified appellant wore his hair over his ears and down to his shoulders. When Dr. Grigson first saw him appellant "had long black hair."

of discovering Linda's body. If I were doing it logically when I was not in such a state of shock and I were writing it and not dictating it, I think I would have worded it differently. *I do not and am not certain that I saw the person's hair.* It was in extremely bright lighting looking at a silhouette. It was a very reflective. It was a reflection really."

Whether it was a matter of "thinking about it for a year," she thought not: "It is *attempting to be logical.*"

Asked if her testimony now is "that you didn't see someone with white hair," Rudolph answered that "my testimony and it's all along that it refers to the person I thought I recognize." She only "perceived that there was a reflection around his head that was silver;" she was not telling the jury that "because the room is well lighted [she] thought [she] saw someone with silver, yet now [she] is telling the jury that someone [had] black hair...." What she is saying is "that I could very well have been mistaken in my original interpretation of my perception." Her recall is no better; it is a matter of "being able to stand back and take a logical look at something rather than reacting emotionally, based on completely preconceived ideas would enable one to make a better interpretation of a perception or almost anything for that matter." Her "identification" on direct examination "is the result of attempting to stand back, recall that figure that I saw, and recall it without preconceived notions that it was someone else."

Rudolph agreed that she may have been asked whether she recognized appellant and that she had never identified appellant in twice testifying under oath and once giving a sworn statement, but she denied that "now over a year later been [she has been] able to conjure up something that would identify him;" she had never been asked by counsel before. Subsequently, responding to questions, she reiterated:

"I have attempted and I said I try to look at this objectively and logically to forget, to keep that image of that figure, that silhouette, in my mind and apply it without—without period. It was a silhouette, I was looking into that bright light. It was a shape, a shape as is probably the most difficult thing to describe. I have attempted and as I said before to apply that shape to see if it fits, forget anything I might have known previously or since.

The shape, it fits.

The outline, the shape, the silhouette against the light. There were shadows. I wasn't specifically aware of the exact shape of his nose or the exact shape of his eye or the color of his eye. I was aware of shadows and planes on a shape, a figure.

I have never said anything else. He fits."

Rudolph concluded with "I believe that is the man I saw," as opposed to "what I thought I saw" at the time.

While rules permitting witnesses to testify on matters of identity are said to be liberal, the Court has recognized "there are certain limitations beyond which it is not safe to go." *Emery v. State*, 95 Tex.Cr.R. 336, 254 S.W. 957 (1923). However, there is a dearth of authority drawing clear lines of limitation.

On admissibility of evidence, the Court has upheld refusal of a trial court to admit proffered testimony that while the witness did not recognize accused at time and occasion in question, from a process of reasoning or believing based on subsequent information he concluded that it was accused he had seen. *Clark v. State*, 79 Tex.Cr.R. 196, 183 S.W. 437 (1916); cf. *Polk v. State*, 500 S.W.2d 825, 826 (Tex.Cr.App.1973). The Court has rejected tendered "misidentification" testimony when it is "speculative." *Turner v. State*, 600 S.W.2d 927, 933 (Tex.Cr.App.1980) (other males in vicinity of crime scene physically resembled accused and drove similar automobile); *Hall v. State*, 153 Tex.Cr.R. 215, 219 S.W.2d 475, 479 (1949) (while witness testified man in khaki clothes beat victim, because common knowledge that many men wear khaki

clothing testimony that a certain man other than accused worked in khaki clothing nearby "too speculative").

In *Proctor v. State*, 465 S.W.2d 759 (Tex. Cr.App.1971), a Constable Coleman observed two men inside a store around 3:00 a.m., and as he sought to apprehend them one burglar came face to face with him and in an exchange of gunfire the Constable was struck by a volley of shots. Although he had known Proctor for years, Coleman was unable to identify him then. ("It didn't register on my mind that that was J.B. Proctor. Just no more than I got to see him.") Coleman became the sole witness placing accused at scene of the burglary.

During a hearing on motion to suppress his incourt identification of Proctor, the witness testified:

"Q. I think you described it to me that you came to the conclusion, or became convinced, as to the identity of Proctor as being the man out there when a chain of pieces or circumstances that fell into place, that you were able finally to conclude in your mind that this was Proctor?

A. Yes, sir.

Q. Of course, all of this that you've described, you jostled your memory to where you were able to positively say that was Proctor?

A. I say I exercised my channels of thought, and stronger and stronger with the days that went by I was more sure of it. I had satisfied myself that it was.

Q. Of course, without all of this investigation, you might never have satisfied your mind that way.

A. No, I don't think I would have."

The Court was "unable to conclude that there was clear and convincing proof that the in-court identification was of independent origin." *Id.*, at 765. In the hospital Coleman gave a description that did not fit Proctor. True it is that "this investigation" had been conducted by the Constable himself, beginning about three weeks after the offense occurred. Learning that an informer in Arkansas had described Proctor and named him as a participant in a shootout with an officer in Texas or Louisiana, Coleman obtained a mug shot of the man mentioned by the informer and set out on his own to find him. Instead, the confederate was arrested in Arkansas and upon being returned to Texas Coleman interrogated him without success; later, however, while Coleman was present he made a confession implicating Proctor in the affair. Coleman also obtained a letter alluding to the shooting. When Proctor was arrested and returned to the venue Coleman went to jail several times and once viewed him in direct confrontation in a maximum security cell. On the day Proctor was arraigned Coleman rode down an elevator with him and was in the courtroom when he was served with indictment.

Paula Rudolph is not a peace officer, of course, but like Constable Coleman her split second confrontation with the person under the circumstances was such that she saw only a "figure," an "outline," a "shape" or a "silhouette." Her every action and words demonstrate that in her mind she then immediately thought and believed the person to be Dean James Mayfield. Obviously at some later day, though this record fails to reveal when or how, she was given to understand her assumption was incorrect. At that point she is in about the same attitude as Constable Coleman, both being unable to identify a person they "saw."

When appellant was arrested in early August Rudolph heard about it. She talked about her description of the figure with numerous police officers and the prosecuting attorneys. As a witness at the August 19 examining trial she saw appellant seated at counsel table between his lawyers and knew he was accused; she also testified at a September 20 hearing on motion for bail; again appellant was present. Finally, almost a year after the fact, like Constable Coleman, through mental processes she described Rudolph "satisfied [her]self" that appellant "fits" the

"figure," "outline," "shape" or "silhouette."

"The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' The Case of Sacco and Vanzetti 30 (1927)."

United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). Sobel, *Eyewitness Identification* (Second Edition), Clark Boardman Co., Ltd. (1986), Ch. 6; Sanders, *Helping the Jury Evaluate Eyewitness Testimony: The Need for Additional Safeguards*, 12 Am.J.Crim.L. 189, 190–191 (1984).

Mistaken identification on the part of an eyewitness may be the result of various factors operating on his unconscious mind. Because they are unknown to the average layperson, "[t]hese subtle but powerful influences ... create the greatest danger of misidentification and wrongful conviction." *Sanders*, op. cit., supra, at 192–193. Experts have divided the human memory process into three stages, towit: acquisition, retention (storage) and retrieval. There are distortions in each stage to such an extent that "eyewitness identifications, even those made under optimal conditions, are highly suspect." *Id.*, at 193.[6]

Once an initial description, along with identification of a known person by name, is recanted by an "eyewitness," much more untrustworthy and hazardous is subsequent identification of a stranger in terms of "figure," "outline," "shape" or "silhouette." Recent experiences in *Ex parte Binder*, 660 S.W.2d 103 (Tex.Cr.App.1983) (five eyewitness making identification, some for first time at trial) and *State of Texas v. Geter* (five eyewitnesses identifying him), dictates an exercise in caution before routinely deferring to verdict of a jury.

### Fingerprint Identification

When Paula Rudolph left her apartment at 10:30 p.m. her impression was that Linda Jo Edwards was going to play tennis with the couple and another man she had met by chance earlier that evening. The record does not show when she left or when she returned, and various bracketed estimates of time of death are not helpful in that.[7] In all likelihood she took her purse with her; it was on the table in the entry way later that morning. Thus she probably

---

**6.** ".... In order to cope with this inherent limitation [in perceiving and encoding stimuli], the observer unconsciously concentrates selectively on the details that are more important to him. This problem of selective perception is exacerbated when a witness is called upon to remember details that were unimportant to him at the acquisition stage but later assumed greater significance. * * * *

Human memory is an active process by which fragments of information are integrated; gaps in the information are filled by inference, and incongruous details are changed so that they 'all make sense.' * * * *

.... Witnesses, like other people, are highly motivated by a desire to conform. * * * *

The danger of misidentification is again magnified by the desire to please authority figures. * * * *"

*Sanders*, op cit., supra, at 194–200 (footnotes omitted).

**7.** The State presented certain testimony of Robert Hoehn in such a way as to suggest when he and appellant walked to the pool at about 11:00 p.m. and appellant invited him to "window peek" Edward's bedroom, that she was there then and appellant saw her. Neither is shown by testimony given by Hoehn. Asked if appellant told him "anything about what he had seen in that girl's bedroom," Hoehn answered. "No. He didn't get close enough to look in the window that night with me." Hoehn was not asked whether, and did not volunteer that, there was any lighting emanating from the bedroom through the window. Nothing suggests Edwards was home. Appellant "never made any more remarks [to Hoehn] about the young woman's bedroom window."

came in through the front door. Whether she returned alone or with some one is an open question. At some point the television in her bedroom was turned on.[8]

As shown by exhibit 101, left from the entry way is a short hallway leading to her "suite" in that side of the apartment, her bathroom on the left and bedroom on the right; Rudolph's is on the opposite side. When Rudolph finally returned the front door was closed but unlocked. She stepped into the entry foyer, saw the figure inside Edwards' bedroom to her left, called out and moved on to her right away from the closed bedroom door. She heard noise of television.

Lt. (then Sgt.) Collard and his team dusted literally every surface throughout the residence and the outer side of the front door and patio door likely to hold a latent print. In Edward's bedroom he checked "any item possibly handled by the suspect" and other articles, and they moved outwardly door to door, room to room to the outside area. His team lifted a total of thirteen latent prints: one from scissors, others from outer side of Edwards' bathroom door, from door frame of her bedroom door, from inside front door, with largest number "coming out of the dishwasher." Of the prints identified, all belong to Edwards or Rudolph—except a single set assigned to appellant lifted from outer metal frame of patio door. Collard called it Latent No. 1.

Five latents remain unidentified; although he examined an estimated 2500 sets of prints Lt. Collard said he was unable to match any one with a known print, sufficient that he would testify by whom it was made. As to where they were found, though he had just identified Defendant's Exhibit No. 1 as a paper on which he listed each latent and its location, Lt. Collard testified:

"There are partially, *I believe*, two or three off of the patio door, and *I believe* one of them from the inner door, *I believe, if I remember correctly*, either the bedroom or the bathroom."[9]

Lt. Collard did not include scissors used to mutilate, perhaps because he had already talked about them. He lifted a latent print from scissors; it was "too faint and not enough details to make a comparison." However, there was enough for Collard to determine the finger leaving the print had a whirl pattern. *No finger of appellant has a whirl pattern.*

The print on scissors could not have been made by appellant. Since he examined some 2500 sets of fingerprints of other persons, Lt. Collard must have been able to rule out that five other latents were left by appellant or Edwards or Rudolph. Collard agreed that "the only thing we have [here today] is that one print"—Latent No. 1. Thus there is no evidence that appellant left his fingerprint anywhere in the entire apartment, and we do not know from this record who left one on the doorway to Edwards' bedroom and four others elsewhere, or when.

### Informer Identification

Whenever charged with the offense of murder, Edward Scott Jackson was confined in Smith County jail from November 28, 1976 through trial of the instant cause. In the latter part of July 1977 he achieved trusty status, and retained it during all pertinent times before trial. He had access to a television set.

Putting aside all testimony from this twentytwo year old witness and others

---

**8.** Although almost always referred to as "bedroom," reality is that Rudolph called it "den and sewing room" and the "bed" a "couch" or "day bed." The bedspread and pillow mentioned in the opinion at p. 931 were on couch; see Vol. 1 S.F. at 106, 109, 110 and Vol. 2 S.F. 197, 229. Human blood was on pillow and also on bedspread along with small white specks of plaster, indicating to Lt. Collard that Edwards' was struck on head with statue while lying on bedspread, head on pillow. Vol. 2 S.F. at 197–198. The prosecution argued she was asleep.

**9.** A "weakened print" was on inside "lower part of the [patio] door," one on "the inner door edge" of the patio door. Other evidence puts Latent No. 6 on doorway to Edwards' bedroom.

about arrangements to have appellant placed in the same tank with him, when "voluntary" statements and admissions were allegedly made to him by appellant, missing jail records and the like, see *ante* at p. 947, practically everything of significance Jackson claims appellant told him about the death of Linda Jo Edwards could have come from his watching news reports on local television. Indeed, Jackson learned her name from that very source, and surely the color of her hair.[10]

There are, of course, some matters mentioned by Jackson that he could not have gleaned directly from media sources. He had related one in an October 18, 1877 statement taken by Detective Clark. On his direct examination the prosecution choose not to develop that matter. It came out on cross-examination, *viz:*

"Q. Did Kerry tell you, allegedly tell you about having a hamburger with this girl?

A. Sir, he said that when he met her, he either met her at an eating place where she works or a girlfriend of hers works. About the hamburger, I don't know.

Q. Are you talking about Linda Jo Edwards?

A. Yes, sir.

Q. How did you know her name?

A. Through the TV.

Q. What else did he tell you about, did he have a date with her?

A. Yes, sir. He said that soon after that he either met her at a bar or took her to a bar.

Q. Do you know which one?

A. No, sir. I don't.

Q. Are we still talking about Linda Jo Edwards?

A. Yes, sir.

Q. So as far as you are concerned, you are telling the Jury then that Kerry knew the victim in this case?

A. Yes, sir.

Q. Which is Linda Jo Edwards?

A. Yes, sir."

The State had known for eight months that Jackson claimed appellant had said he knew Edwards before her death. Most assuredly that point would be investigated thoroughly for it obviously bore on the prosecutorial theory of its case. Clearly in testimony the prosecutor elicited from Paula Rudolph and other witnesses there is no thought that either Jackson or, assuming he actually said it, appellant was being truthful. On redirect examination the prosecutor did not allude to that matter, nor in his final argument; neither did defense counsel.

As to whether Jackson had some understanding about disposition of the murder charge against him pending trial eighteen months at his own request, on cross examination there was the following exchange:

"Q. .... Did you make a statement on the elevator last week that you were getting out of here, that your case was going to be dropped to manslaughter and you were going to be given credit for the time served if you testified in this case.?

A. No, sir, *not the way you put it.* I could explain that.

Q. No, I just want you to answer the question.

A. No, sir."

Of course, William Fomby would and did swear for appellant that Jackson said he was going to testify for the State because, in more precise terms:

"He said that this was—that this was an ace in the hole on this case and that the District Attorney said that they were going to *reduce his charge from murder to involuntary manslaughter and give time served.*" [11]

"The proof of the pudding," as they say, could not then be determined. See *ante,* n.

---

**10.** At page 934 the majority opinion faithfully reports Jackson's account of what appellant supposedly told him about the killing. However, there is a major omission in the version as told by Jackson: he said nothing about a plaster statue.

**11.** In rebuttal, the State called Woody Roark, appointed attorney for Jackson. Roark testified

3, at p. 947. May 6, 1977 Jackson was indicted in Cause No. 7–77–90 for murder, but his case had not been resolved. Sentence of death and commitment in this cause was signed and filed July 17, 1978. Within less than a month, from a certified copy of sentence in said Cause No. 7–77–90 the provable facts are that on August 15, 1978 in the presence of Edward Scott Jackson and his attorney Woody Roark a different judge of a trial court ordered that Edward Scott Jackson who, had been adjudged guilty of *"Involuntary Manslaughter, A Felony,"* and whose punishment had been assessed at two years confinement in the penitentiary, be delivered to the Director of Corrections to be confined for "a term of not less than two (2) nor more than two (2) years," and to be *"given credit for 625 days served in the Smith County Jail."*

### Considerations

There are three principal incidents produced by the State to make its case: a "figure" whirling in Edwards' bedroom at an early morning hour; appellant's leaving a partial set of his fingerprints on outer side of patio door frame; his purported conversation with Jackson. The first two are as parts of a different puzzle in that one does not easily fit together with the other.

The State sought to make them mesh, it seems to me, with testimony of Hoehn—not all his prejudicial kinky sexual stuff, but that he had let appellant out in a near-

by area of the apartment complex. The State argues because appellant was at large in the complex at 12:30 or 12:35 a.m. and was either lusting after Edwards (according to the Dykes brothers), or going to punish her (according to Jackson), he went straight way to rear of Apartment No. 169, walked up several steps, lifted latch to and opened wooden gate to patio, moved to sliding patio door, opened it, entered and closed it, picked up statue, made his way to her room, knocked her out with statue, stabbed her many times with scissors, went to kitchen, selected french knife, went back, pulled her off couch, cut her ear lobe loose and sliced artery and jugular vein, mutilated her body from front, turned it over, stabbed upper back, cut vagina from back to front, also using scissors, and doing what else was done—stripping down to shorts somewhere along the way—in ten minutes, fifteen at the most.

Dr. Gonzales testified that to do such damage "in this area here" alone probably took "five to ten minutes." Vol. 5 S.F. at 877.

The figure whirls and closes bedroom door, and Rudolph assumes it is a boyfriend in the person of Dean Mayfield, and five minutes later when someone opens and closes patio door at the rear, she also assumes the boyfriend is leaving. All is well and she is asleep in five minutes. She did not see Edwards and nothing in this record ever shows Edwards was in her room when Rudolph glimpsed a figure and assumed Dean Mayfield was calling on her.[12]

At trial, however, Rudolph says she was wrong then, and logically appellant "fits"

---

that there had been no plea bargaining for Jackson "since on or about October 27, 1977, [the] time I first became aware of Mr. Jackson's involvement as a potential witness in this cause," and he instructed his client that "I would engage in no plea bargaining nor would he in this case." However, Roark did "think" Jackson talked to an agent of the district attorney "without [his] presence," and acknowledged that "those discussions with [his] client in [his] absence were with [his] permission as attorney of record. . . ."

**12.** When Paula Rudolph testified at the August examining trial and again at the September bail hearing she seems to have stayed with her de-

scription of the person she saw in Edward's bedroom. See, *ante* at p. 949. On January 9, 1978, counsel for appellant filed a motion to take the deposition of Dean Mayfield, alleging, *inter alia*, that Mayfield was represented by an attorney who, though requested, denied him an interview with Mayfield, that Mayfield is a material witness, that Mayfield "was the prime suspect regarding the death of Linda Jo Edwards and, presently, still is a suspect," and that without obtaining testimony from Mayfield, counsel is unable adequately to prepare a defense.

The judge of trial court ordered the deposition taken, and he presided over the taking February 1, 1978. Dean Mayfield did not testify during

the image in her mind. Someone was in the bedroom, to be sure. But the bare fact that his "entry" fingerprints are lifted from outer frame of patio door will not serve to corroborate Rudolph because Lt. Collard opined they would have been made any time from eight o'clock in evening of June 9 to eight o'clock in morning of June 10.[13]

Furthermore, there is an unidentified latent print on that doorway to Edwards' bedroom, and another on innerside of unlocked front door. There are also two unidentified latents on the frame of patio door. Many of the same factors considered by Lt. Pollard in estimating when appellant's prints were placed on the patio door should also apply to the other two latents found there. That the latents are unidentified means only that known prints of the person or persons leaving them during the same period of time were not available to Pollard. It cannot be rationally concluded that the "figure" was appellant because his prints were identified and the two other latents were not.

In sum, I am unable to agree that the evidence is sufficient and, therefore, I respectfully dissent.

---

trial. Nevertheless, included in a supplemental transcript is what purports to be a copy of several introductory pages of the deposition down to the point where Mayfield was sworn to tell the truth—and nothing more. Given that circumstance, we ordered the original deposition forwarded to this Court, and have since determined that neither the fact it was taken was made known to nor any part of it was used before the jury, so there was no occasion for it to become part of the initial record.

13. In argument a defense lawyer suggested to the jury that shortly before 8:00 a.m. appellant may have come through the back gate, opened sliding door and, leaning in out of curiousity, put his fingerprints on the frame at that time. The facts are that Rudolph got up about ten minutes to seven, plugged in a coffee maker,

walked back to her bedroom, saw the opened wooden gate and went out and closed it, came back in and in looking for her cat pushed open the door to Edwards' room and saw her bloody arm and head, went to call police (in response to her report that Edwards had been beaten, dispatcher said an ambulance would be sent), returned to Edwards room and viewed that scene, backed out of room and apartment and was leaning against a post when an ambulance "came shortly thereafter." Vol. III S.F. 495. Attracted by sight or sound of that ambulance, appellant could have done what counsel contended. It might even explain observation of Randy Dykes that appellant looked "somewhat shocked" upon hearing a news report later in the morning.